COMMONWEALTH *vs.* GEORGE J. HEBERT.

Hampden.   September 24, 1928. — October 8, 1928.

Present: RUGG, C.J., PIERCE, CARROLL, WAIT, & SANDERSON, JJ.

*Practice, Criminal,* Continuance. *Abortion. Pleading, Criminal,* Indictment, Bill of particulars. *Evidence,* Competency, Expert, Dying declaration, Admission.

It was not an abuse of discretion for a judge of the Superior Court to deny a motion for a postponement of the trial of an indictment for the procuring of an illegal abortion, where the ground of the motion was the fact that newspapers within the county had published a statement, made by that judge in sentencing another defendant who had been convicted of that offence, to the effect "that it should be known throughout the State it has been heard that illegal operations of this kind have been performed frequently in this county and that it should be made clear that people who performed them are to be dealt with according to the statutes of Massachusetts."

An indictment, found and returned in the county of Hampden, and charging that the defendant "at Holyoke, in the county of Hampden . . . with intent to procure the miscarriage of L, did unlawfully use a certain instrument upon the body of said L and in consequence thereof, the said L died," charged the defendant with the commission of a crime within the jurisdiction of the court.

In response to a motion by the defendant in the indictment above described for particulars, requesting that the Commonwealth be required to specify the nature, kind and description of the instrument which the defendant was alleged to have used and also the manner in which the defendant used the instrument, the Commonwealth filed a bill of particulars specifying "that the instrument used by the defendant, as far as known to the Commonwealth, was an instrument, of a particular nature, kind and description unknown to the Commonwealth, which was inserted into the person of the deceased by the defendant." A motion by the defendant for further particulars was denied. *Held,* that such motion properly was denied.

A physician who previously had treated the woman named in the indictment above described as the victim of the abortion, testifying for the Commonwealth, stated that he was called to see her on March 9 and made an external examination of her; that, knowing her as he did, he "considered it nothing more than an ordinary miscarriage"; and that the next morning he made another examination. Subject to exceptions by the defendant, he then testified that he came to the conclusion that she had had an abortion of some type or form, and that he came to that conclusion because during the night she had chills, "had run a tempera-

ture during the night of 103, complained of being cold and there was a very foul odor." *Held*, that there was no error in admitting in evidence the conclusion reached by the physician on March 10.

It was not error to refuse to strike out, from testimony by a house surgeon at a hospital to which the victim of the abortion charged in the indictment above described had been removed, who had testified that, after an examination on March 10, he had diagnosed the case as septicemia resulting from an abortion and he had consulted with another physician, a further statement, "We called Detective D."

At the trial above described, it was proper to permit the medical examiner of the district wherein the woman died, after a detailed description of an autopsy performed by him, and an expression of his opinion that she died of septicemia which originated from an induced abortion, further to state that he had formed an opinion that the abortion must have been induced by instruments in some way.

At the trial of the indictment above described, a stenographer who was present at an interview between the medical examiner and a State detective and the woman at nine o'clock in the evening before she became semiconscious at 3:30 and unconscious at four o'clock the next morning, testified in substance that each man stated to the woman that he was of the opinion that she would not get well, and that they wanted to talk to her, and that she replied that she understood she was not going to get well and that her statement was her dying statement. The stenographer further testified that after she had taken the statement, as she was leaving the room, she heard the woman "begin to cry, she said something, she did not see why she couldn't get better." The judge, subject to exceptions by the defendant, admitted the entire statement of the woman taken down by the stenographer. *Held*, that

(1) There was no error in admitting the declaration of the woman as a dying declaration;

. (2) The patient's remark to the effect that she did not see why she could not get well might affect the weight to be given to the testimony, but did not render the declaration incompetent as a dying declaration.

At the trial of the indictment above described, the judge, subject to exceptions by the defendant, admitted evidence that when the defendant, while under arrest, was confronted with the woman and she accused him of performing the illegal operation, he was asked if he knew her and answered, "I have no recollection of ever seeing this woman." He then was asked, "What do you say as to what she has just accused you of?" and he replied, "I have nothing to say." *Held*, that the defendant's answers were not a direct denial of the woman's accusation but were equivocal and evasive to such an extent that the evidence became admissible as an admission against him.

INDICTMENT, found and returned on May 11, 1928, and described in the opinion.

Preliminary motions were heard and disposed of by *Burns*, J., as stated in the opinion. The indictment was tried before him on June 7–13, 1928, under the provisions of

§§ 33A–33G, added to G. L. c. 278 by St. 1925, c. 279, § 1, and amended by St. 1926, c. 329, §§ 1–6.

Dr. Thomas Francis Corriden, referred to in the opinion, had testified that on March 10, 1928, at Cooley Dickinson Hospital in Northampton, where he was a surgeon on service, after he had diagnosed the condition of Mrs. Lyman, he formed an opinion that she was suffering from septicemia resulting from an abortion; that he gave her treatment and called Dr. Brown. He then testified that, after consultation with Dr. Brown, "We called Detective Daly." Daly was a State detective. The defendant moved that the last statement be struck out. The motion was denied. This was the defendant's fifth assignment of error.

Dr. Edward W. Brown, referred to in the opinion, was the medical examiner of the district within which Northampton is. After detailed testimony as to an autopsy performed by him, he stated as his opinion that the woman "died of blood poisoning, septicemia we call it, which originated in this diseased uterus from an induced abortion." Subject to exception by the defendant, he then was asked, "Did you form any opinion as to the manner of the induced abortion?" and stated, "I think a case like that must have been induced with instruments in some way."

Other material evidence and exceptions relied on by the defendant in this court are stated in the opinion. There was no exception to instructions given to the jury by the judge. The defendant was found guilty and filed an appeal with an assignment of errors.

The case was submitted on briefs.

*R. P. Stapleton & F. Hurley*, for the defendant.

*C. S. Lyon*, Assistant District Attorney, for the Commonwealth.

CARROLL, J. The defendant was found guilty upon an indictment which charged that he, "with intent to procure the miscarriage of Eva G. Lyman, did unlawfully use a certain instrument upon the body of said Eva G. Lyman and in consequence thereof, the said Eva G. Lyman died."

The first assignment of error concerns the denial of the defendant's motion for a postponement or continuance of

the trial. The motion alleged that newspapers within the county of Hampden published a comment made by the presiding judge, it was contended, in sentencing a defendant who had been convicted of performing an illegal abortion. The motion alleged that the statement of the judge as reported in the newspapers was "that it should be known throughout the State it has been heard that illegal operations of this kind have been performed frequently in this county and that it should be made clear that people who performed them are to be dealt with according to the statutes of Massachusetts." This motion for a continuance of the case or the postponement of the trial was addressed to the judicial discretion of the judge. It is not shown that this discretion was abused, and his decision on the question is not to be reversed. *Commonwealth* v. *Capland*, 254 Mass. 556, 559, 560. *Commonwealth* v. *Friedman*, 256 Mass. 214.

The defendant filed a motion for a bill of particulars, requesting that the Commonwealth be required to specify the nature, kind and description of the instrument which the defendant is alleged to have used upon the body of Eva G. Lyman, and also the manner in which the defendant used the instrument. This motion was allowed, and the Commonwealth filed a bill of particulars specifying "that the instrument used by the defendant, as far as known to the Commonwealth, was an instrument, of a particular nature, kind and description unknown to the Commonwealth, which was inserted into the person of the deceased by the defendant." Thereupon the defendant moved that the Commonwealth be required to answer further his original motion for a bill of particulars; this motion after a hearing was denied.

The defendant then filed a motion to quash on the ground that it did not appear by the indictment that the offence was committed within the jurisdiction of the court; "That it does not fully and plainly, substantially and formally set forth the nature, kind or description of the said instrument alleged to have been used nor that the same was to the Grand Jurors unknown"; that the indictment was bad for duplicity in alleging that an instrument was used without a statement that the nature of the same was unknown to the

grand jury.  After a hearing this motion to quash was denied.

The indictment charged the defendant with the commission of the crime within the jurisdiction of the court.  It alleged that the defendant "at Holyoke, in the county of Hampden," in order to procure the miscarriage of Eva G. Lyman did unlawfully use an instrument upon her body and in consequence thereof she died.  See *Commonwealth* v. *Snell*, 189 Mass. 12, 17.

The denial of the motion for further particulars was right. In response to the request of the defendant that the Commonwealth be required to specify the nature and description of the instrument used, it set out that the nature, kind and description of the instrument were unknown to the Commonwealth.  It would be idle to compel the Commonwealth to describe in detail an instrument unknown to it.  If the presiding judge was satisfied that this statement was true, the defendant was deprived of none of his rights by the refusal to allow his motion for further particulars.  *Commonwealth* v. *Howard*, 205 Mass. 128, 142, 143.  *Commonwealth* v. *Cline*, 213 Mass. 225, 226.

There is nothing contrary to this in *Commonwealth* v. *Sinclair*, 195 Mass. 100.  In that case it was said at page 107: "the indictment did not set out the charge against the defendant with sufficient fulness to deprive him of the right to require a bill of particulars."  It is not disputed that the defendant could as of right under the indictment as drawn demand a bill of particulars, but he could not require the Commonwealth to describe further an instrument of which it had no knowledge.  See *Commonwealth* v. *Coy*, 157 Mass. 200, 215; *Commonwealth* v. *Noble*, 165 Mass. 13, 15, 16.

The fourth assignment of error is based on exceptions to the testimony of Dr. Murphy.  He testified that on the night of March 9, 1928, he was called to the home of Mrs. Lyman and made an external examination of her; that "knowing Mrs. Lyman as I did, having taken care of her in the past, I considered it nothing more than an ordinary miscarriage."  He was then asked "Did you subsequently reach any diagnosis that differed from that?" he answered

"I did." This question was then put: "What was the diagnosis that you eventually formed?" The defendant excepted. Dr. Murphy stated that the next morning he "came to the conclusion she had had an illegal abortion, or an abortion of some type or form." The judge directed that the word illegal be stricken from the answer. Dr. Murphy's testimony showed that he came to the conclusion that the patient was suffering from an abortion, because during the night she had chills, "had run a temperature during the night of 103, complained of being cold and there was a very foul odor." Dr. Murphy was Mrs. Lyman's physician. His qualifications were not questioned. Without exception, he testified that on March 10 he came to a different conclusion from the one he had first formed. There was no error in permitting him to state what his final diagnosis was; the reasons he gave for this final conclusion were based on his observations and the patient's complaint of cold, although he also testified that he came to the final conclusion independently of anything said to him by Mrs. Lyman. *Commonwealth* v. *Russ*, 232 Mass. 58, 72, 73. He also testified that he saw the fetus on the night of March 9; that "it was lying in the bed and . . . [he] saw it." The fourth assignment of error is without merit. *Commonwealth* v. *Thompson*, 159 Mass. 56, 58. *Commonwealth* v. *Wagner*, 231 Mass. 265, 267.

There was no prejudicial error in refusing to strike from the testimony of Dr. Corriden the statement, "We called Detective Daly"; nor in admitting the testimony of Dr. Brown.

Assignments of error numbered 6, 9, and 10, relate to the admission in evidence of the declarations of Mrs. Lyman as dying declarations. Miss Fenton, a stenographer, testified that she was called to the Cooley Dickinson Hospital where Mrs. Lyman was a patient and took her statement in shorthand; that Dr. Brown said to Mrs. Lyman, "I want to talk to you. You understand me?" Mrs. Lyman said "Yes"; that Dr. Brown said "You know you are getting worse, don't you Mrs. Lyman, have not been doing very well today?" Mrs. Lyman answered "No"; that Dr. Brown then said "We have been talking it over and we don't think you are

going to get better," to which Mrs. Lyman said "That is too bad"; that Dr. Brown said "It is. You understand that you are not going to get well?" and Mrs. Lyman replied "Yes"; that Dr. Brown said "Mr. Daly wants to talk to you. . . . Whatever you say to Mr. Daly is with the understanding you are not going to get well and you are making this as your dying statement." Mrs. Lyman said "Yes, all right"; that Mr. Daly spoke to Mrs. Lyman asking if she knew him, Mrs. Lyman replying "Mr. Daly"; that Mr. Daly then stated: "You understand what Dr. Brown said to you that you are not going to live," and Mrs. Lyman said "Yes"; that she was then asked by Mr. Daly who the doctor was who operated on her and she said Dr. Hebert of Holyoke, at his house in Holyoke, he was paid $25 by her husband; that Mrs. Lyman then said that all the statements she signed a day or two before the interview were true; that Mr. Daly then said, "And you say that knowing you are going to die and all these other statements are true?" and Mrs. Lyman replied "Yes." The stenographer further testified that after she had taken the statement, as she was leaving the room, she heard Mrs. Lyman "begin to cry, she said something, she did not see why she couldn't get better."

The declaration relied on by the Commonwealth as a dying declaration was made after nine o'clock in the evening of March 18, 1928; at thirty minutes after three o'clock on the next morning the patient was semi-conscious, and she became unconscious after four o'clock, and died early in the morning of March 22. The dying declarations of a woman whose death is alleged to have resulted from a criminal abortion are admissible under G. L. c. 233, § 64. There was no error in admitting the declaration of Mrs. Lyman as a dying declaration. There was sufficient evidence to satisfy the presiding judge of the declarant's belief in the certainty of approaching death. The patient's remark, "I don't see why I can't get well, other people have been through the same thing" might affect the weight to be given to the testimony, but did not render the declaration incompetent as a dying declaration. *Commonwealth* v. *Turner*, 224 Mass. 229, 236. *Commonwealth* v. *Wagner, supra,* page 266.

The next assignment of error relied on by the defendant concerns the statements made by Mrs. Lyman in the presence of the defendant and his replies thereto. In his presence and hearing, Mrs. Lyman accused him of performing the operation. The defendant was then asked if he knew this woman and he answered "I have no recollection of ever seeing this woman." He was then asked "What do you say as to what she has just accused you of?" and he replied "I have nothing to say." The defendant was then under arrest; the accusing statements were made in his presence and hearing; he could have remained silent, but if his answers were equivocal or such as an innocent person would not make, the declaration and his replies were admissible. He said he had no recollection of having seen the woman. This was not a direct denial of her accusation; it was equivocal and evasive to such an extent that the evidence became admissible as an admission against him. His further answer that he had nothing to say did not make the evidence incompetent; this last remark was not the only one he made, it was a part of the same conversation, and is not to be considered as the only statement made by him. In our opinion the instructions on this point were free from error. *Commonwealth* v. *Brown,* 121 Mass. 69, 74, 80, 81. *Commonwealth* v. *Spiropoulos,* 208 Mass. 71, 73, 74. *Commonwealth* v. *Madeiros,* 255 Mass. 304.

The defendant's motion for a directed verdict was denied properly.

*Judgment affirmed.*