## Commonwealth *v.* Turza, Appellant.

Argued September 30, 1940.  Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Fred B. Trescher,* with him *Thomas A. Waggoner, Jr.,* for appellant.

*Samuel J. Feigus,* Assistant District Attorney, with him *H. Vance Cottom,* District Attorney, for appellee.

OPINION BY MR. JUSTICE PATTERSON, November 25, 1940:

John Turza, appellant, was jointly indicted with one Luther "King Kong" Royston and one Clyde "Blue Top" White for the murder of Henry D. Foster. Separately tried, Turza was convicted of first degree murder and sentenced to life imprisonment. The defense was an alibi.

Shortly before midnight, on December 3, 1938, Henry D. Foster, who had left his farm, a few miles from Connellsville, at about six o'clock that evening, in good health and with a wallet on his person containing at least seven twenty-dollar bills, was found lying insensible on Arch Street, in Connellesville, suffering from a laceration near the base of the skull, on the right side, one and a half inches in length and one-tenth of an inch in width. He was immediately taken to the Connellsville State Hospital where he died the following morning without regaining consciousness. Death was ascribed by the attending physician to a multiple basal skull fracture and cerebral hemorrhage, apparently the result of a violent blow inflicted with a small blunt instrument. When Foster's clothing was searched upon arrival at the hospital, the only money found was one

five-dollar bill, four one-dollar bills, and some loose change contained in a small change purse; the wallet and the large bills that he carried with him when he left home were missing. Prior to the discovery of his unconscious form on Arch Street, Foster was last seen by his nephew, with whom he had driven to Connellsville, walking along Arch Street in the direction of Cypher's Tavern, located on the corner of Arch and Peach Streets, about 40 feet down the street, on the opposite side, from the point where the unconscious Foster was discovered, and thereafter by a waitress in Cypher's Tavern.

During the course of the police investigation into Foster's death, Royston came under suspicion of the authorities and was taken into custody for questioning. On his person the officers found $116.20, including four twenty-dollar bills and in his room a quantity of new clothes and a new traveling bag. The questioning of Royston led to the arrest of Turza and White, both of whom, like Royston, were on relief. In Turza's room the officers found a pocketbook containing eight twenty-dollar bills on a cupboard shelf, under some papers, and in White's apartment four twenty-dollar bills were found concealed in a picture frame. An information was made against the three for Foster's murder, following which, on December 31, 1938, they voluntarily made and signed separate statements in writing.

The statements made by Royston and White, while differing in minor details, related that, during the late afternoon of December 3, 1938, they and Turza were together in White's apartment discussing their need of money; that Turza left saying he was going out to see if he couldn't "run onto something" or "to see what's on the line"; that forty-five minutes to an hour later Turza returned saying that he had seen a man with a bankroll, identified as Foster, and had trailed him to Cypher's Tavern; that thereupon the three of them laid their plans for the robbery; that pursuant thereto

Turza pointed out the victim and moved his car to a convenient place for a getaway, White took up his position as lookout and Royston, because he was "the strongest man," after waiting near the entrance to the tavern until Foster came out, made the assault; that when Royston had completed the robbery and had possession of the money, Turza drove them from the scene to a spot on the Mt. Braddock road, where they divided the money; and that they then returned to Connellsville and separated. When Royston's statement was read to Turza and he was asked whether it was the truth, he grinned and replied, "If the two jigs say it's right, it's right" and, on being asked again, answered, "You'll see, you'll see"; when White's statement was read to him and he was asked whether it was the truth, he grinned but remained silent. In his own signed statement, Turza said that all he would admit was that Royston gave him $200 "that he took from the old man" and which he, Turza, "knew at the time was money he got when he robbed and killed Mr. Foster"; that he spent $40 of that money knowing it was dead man's money; that he lied when he told the officers that the twenty-dollar bills found in his room was money earned and saved by him, "as it was in fact part of the loot taken in the robbery of Mr. Foster"; and that Royston told him and White that if anything happened over the Foster robbery and murder he, Royston, "would take the rap for it."

Following these statements, Turza and White, having been taken to the Mt. Braddock road for that purpose, pointed out the spot where the money had been divided on the night of the robbery. As they approached the scene Turza said "Keep going, keep going. I will show you. It's on the right-hand side" and then "Here it is right here." When White was asked, "Is that right, Blue?" he replied, "Well, it's just about right here." And, later, Turza declared, "The jigs squealed on me in the Connellsville job, I will squeal on them in the Scott-

dale job," whereupon he implicated Royston and White in a robbery and murder committed in Scottdale on one Naum Acheff, on December 13, 1938, ten days after the death of Henry Foster but prior to the arrest of Royston, White and Turza, in which he claimed to have been innocently involved. As a result of this information all three were indicted in Westmoreland County for Acheff's murder and were tried first on that indictment. Royston was convicted of first degree murder, White was convicted of second degree murder and Turza was acquitted.

The principal complaint of appellant relates to the reception, as evidence against him, of the signed statements of Royston and White, as well as his own statement, without which it is contended there is an insufficiency of evidence to sustain the verdict. Appellant argues that the circumstances of Foster's death were as consistent with his having been struck by a passing truck as with the theory that he was the victim of an assault and concludes that for this reason, as well as for the additional reason that there was no independent proof, as he contends, that he was the responsible party or one of the responsible parties, that the corpus delicti was not sufficiently proved; further that his silence when the White statement was read to him and his responses to the reading of the Royston statement did not make them available, as admissions, against him. The other complaints relate to the trial judge's permitting Royston and White, called as witnesses for the Commonwealth's side of the case, to be cross-examined on a plea of surprise, and his refusal to withdraw a juror because of allegedly unwarranted remarks of the district attorney in his summation to the jury.

The rule, attempted to be invoked by appellant, that an extrajudicial admission or confession of one accused of crime cannot be received in evidence unless and until the corpus delicti of the crime has first been established by independent proof, and that failure to comply with

this prerequisite will exclude the admission or confession, is a familiar one. But, this does not mean, as appellant contends, that the Commonwealth must preliminarily and independently establish all the elements of the charge, i. e., (1) the occurrence of an injury or loss—in homicide, a person deceased, (2) somebody's criminality as the source of the injury or loss—in homicide that the death was caused by a beating, gunshot or other circumstances indicating a felonious act, and (3) the accused's identity as the responsible party or one of the responsible parties. "By this view, the term 'corpus delicti' would be synonymous with the whole of the charge, and the rule would require that the whole be evidenced in all three elements independently of the confession, which would be absurd." Wigmore on Evidence (3rd ed.), section 2072. The grounds on which the rule rests are the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed; consistent therewith, all that the rule requires is that the first two of the above-mentioned three elements be independently established. Thus, whenever, as here, the Commonwealth, in a homicide case, has established that the person for whose death the prosecution was instituted is in fact dead and that the death occurred under circumstances indicating that it was criminally caused *by someone,* the rule is satisfied and admissions or confessions of the accused may then always be received as proof of the identity of the guilty agent: *Com. v. Gardner,* 282 Pa. 458, 463; *Com. v. Puglise,* 276 Pa. 235, 238.

The circumstances of Foster's death were clearly consistent with the theory of homicide. As the court below pointed out, the nature of his wounds was such as to have made it next to a physical impossibility that they could have been received by accident. And, when the nature of the injuries is considered in connection with the other circumstances of the case, particularly

the missing wallet and the money contained therein, the circumstances attending the death are hardly consistent with any other rational theory. But, assuming that they are not inconsistent with death by accident, it does not follow, as appellant contends, that the corpus delicti was not sufficiently proved. "It sometimes happens the circumstances attending the act may be consistent with crime, suicide or accident. In such cases, the corpus delicti is proven where the circumstances attending the death are consistent with crime, though they may also be consistent with accident *(Commonwealth v. Johnson,* 162 Pa. 63), or suicide *(Zell v. Com.,* 94 Pa. 258), and it is not necessary to show by affirmative proof that the latter two possibilities do not exist before evidence as to who did the act is admitted." *Com. v. Gardner,* supra, 464. See also *Com. v. Coontz,* 288 Pa. 74, 79; *Com. v. Marshall,* 287 Pa. 512, 519; *Com. v. Bishop,* 285 Pa. 49, 53. "There is no rule of criminal law which requires absolute certainty about this or any other question of fact. If it were otherwise, it would be impossible to convict of any offense in any case. All that the law requires is that the corpus delicti shall be proved as any other fact, that is, beyond a reasonable doubt, and that doubt is for the jury." *Gray v. Com.,* 101 Pa. 380, 386; *Com. v. Puglise,* 276 Pa. 235, 239. The corpus delicti having been properly and sufficiently established, appellant's own statements and admissions were undoubtedly properly received as evidence against him, as were also the statements of White and Royston.

The natural reaction of one accused of crime being to deny the accusation if it is unjust or unfounded, it is well settled that the acquiescence of such a person to an incriminating statement made or read in his presence will be given the effect of an admission in a criminal prosecution against him, provided there was motive or opportunity to deny. *Com. v. Karmendi,* 328 Pa. 321, 335; *Com. v. Carelli,* 281 Pa. 602, 606; *Com. v. Mazarella,* 279 Pa. 465, 470; *Com. v. Brown,* 264

Pa. 85, 92; *Com. v. Ballon,* 229 Pa. 323, 327; *Com. v. Johnson,* 213 Pa. 607, 608; *Com. v. Zarombo,* 205 Pa. 109, 112. And, in these situations, evasive and equivocal responses are tantamount to absolute silence. *Com. v. Westwood,* 324 Pa. 289, 302; *Com. v. Herbert,* 264 Mass. 571, 163 N. E. 189; *Com. v. Madeiros,* 255 Mass. 304, 151 N. E. 297; *People v. Popilsky,* 366 Ill. 268, 8 N. E. (2nd) 640; Anno. 80 A. L. R. 1249. As the court below states: "Of Turza's responses when Royston's confession was read to him: 'If the jigs say it's right, it's right,' and 'You'll see, you'll see,' the best that can be said is that they are equivocal and evasive, and not a denial such as an innocent person would make . . . So, too, his grinning silence when the White statement was read to him and he was asked whether it was the truth, was extraordinary under the circumstances. Evidence of this character is for the jury whenever the occasion and the attendant circumstances call for serious admission or denial, its weight depending upon the force of the circumstances and the motives which must impel one so accused to an explicit denial if the statement be untrue. . . . Money believed to be Foster's and admitted by Turza in his signed statement to have been the proceeds of Foster's robbery, had been found in his possession. He had, therefore, every motive, as well as opportunity, to repudiate Royston's and White's charges against him if they were false. Plainly his unnatural reaction in each instance was evidence from which an admission could be found by the jury."

Appellant points to factual discrepancies between the accounts of the Foster murder as set forth in the statements of White and Royston and that established by the Commonwealth's witnesses relative to Foster's movements and the time thereof on the night of December 3, 1938, the manner in which his injuries were inflicted, the color of his wallet, etc.; this, he contends, places the stamp of incredibility upon these statements

and at the same time lends credibility to his testimony and that of White and Royston, at the trial in the court below, that the statements assuming responsibility for Foster's death were false and made solely for the purpose of diverting inquiry into their participation in the "Scottdale Case," for which they had already been tried and which they believed to be more "cold-blooded" and consequently a much more serious crime. The credibility of the statements as well as the explanation given as to why they were made was, notwithstanding the discrepancies, all of which were minor and such as might naturally be expected to creep into the trial of any case, clearly for the jury. "When a statement is made from the witness stand which is at variance with an earlier statement made by the same person and an explanation is given as to why the earlier statement was made, the acceptability of this explanation is exclusively for the jury to determine." *Com. v. Alessio,* 313 Pa. 537, 544. See also *Com. v. Westwood,* supra, 300.

The complaint that the Commonwealth was improperly permitted to cross-examine Royston and White with reference to their previous signed statements when, called as its witnesses, they testified that they had not seen appellant on the night of December 3, 1938, is likewise without merit. "Where a party is surprised in the testimony of a witness by his unexpectedly turning hostile, counsel may exercise the right of cross-examination of the witness, or impeach his testimony by other witnesses. . . . Whether such practice will be permitted is within the sound discretion of the court, and its action will not be reviewed by this court unless there is an abuse of that discretion." *Com. v. Reeves,* 267 Pa. 361, 363. The learned trial judge was satisfied, and justifiably so, that the hostility of these witnesses was unexpected and that their testimony which, if accepted unchallenged, aided the cause of appellant, came as a surprise to the Commonwealth. Under these circumstances it was not error for the court to permit the district at-

torney to cross-examine Royston and White and to ask them whether they had not made previous declarations to him, reciting the declarations which were in contrast with their testimony at the trial: *Com. v. Spardute,* 278 Pa. 37, 45. See also *Com. v. Lehman,* 309 Pa. 486, 497-8; *Com. v. Delfino,* 259 Pa. 272, 276; *Com. v. Deitrick,* 221 Pa. 7, 16. The trial judge wisely exercised the discretion vested in him in permitting the cross-examination, and he sufficiently guarded its effect in his charge, the relevant portion of which is as follows: "You will recall that the commonwealth called as its own witnesses both Royston and White, and that each of them gave testimony on direct examination that caused the commonwealth to plead surprise, Royston testifying that he did not think he had seen Turza at all on December 3, 1938, and White testifying that he had not seen him after four-thirty o'clock. Thereupon, we permitted them both to be cross-examined by the commonwealth for the sole purpose of affecting their credibility in respect to the testimony they had given on direct examination. Therefore, you are not to consider their testimony on cross-examination, or any prior contradictory statements that are alleged to have been made, as substantive evidence in aid of the commonwealth's case, but only for the purpose of neutralizing the effect of the testimony given by these witnesses to which the commonwealth pleaded surprise." *Com. v. Deitrick,* supra, 16-17; *Com. v. Touri,* 295 Pa. 50, 55-56. In any event, since the written statements about which the witnesses were cross-examined were later received substantively, and properly so, as we hold, the question becomes immaterial. See *Com. v. Reeves,* supra, 363; *Com. v. Delfino,* supra, 277.

Finally, appellant contends that the trial judge committed reversible error in refusing to withdraw a juror because of allegedly improper remarks by the district attorney in his summation to the jury. While it may be that some of the comments complained of were not entirely warranted as fair deductions from the evidence

presented, we are satisfied that they were not so flagrant that any tendency they might otherwise have had to prejudice appellant was not effectively cured by instructions immediately given to the jury to "disregard completely the matters complained of" and that their consideration of the case "must be restricted wholly to the testimony that has been heard here in court during the progress of this trial, and such inferences therefrom as may logically be drawn." Counsel for appellant was apparently also satisfied, for no exception was taken either to the refusal of his motion to withdraw a juror or to the sufficiency of the court's admonition. As stated in *Com. v. Touri,* supra, 58: "Complaints, such as are now insisted on, are in the first instance addressed to the trial court, and only where its action discloses an abuse of discretion will a reversal be justified." We all agree that this is not a case calling for such action.

We have carefully reviewed the entire record to determine whether, accepting as true all the evidence adverse to appellant, the ingredients necessary to constitute murder in the first degree are present, as is our duty in all such cases, and find that they are.

The judgment is affirmed and the record is remitted so that the sentence may be carried out.