731 A.2d 581

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Nicholas YARRIS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 29, 1998.

Decided May 21, 1999.

Reargument Denied Sept. 21, 1999.

Robert Brett Dunham, Philadelphia, for N. Yarris.

Sheldon Kovak, Robert A. Graci, Harrisburg, for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

This is an appeal from the denial of a petition seeking relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546, in a capital case. Concluding that the petition was untimely, we affirm.

## I. Background

On July 1, 1982, a jury convicted Appellant, Nicholas Yarris, of kidnapping, rape, robbery, and first degree murder in connection with the fatal stabbing of Linda Craig, a salesperson at a shopping mall in the state of Delaware, in December of the previous year. Ms. Craig's automobile was found along a roadway in Chichester, Delaware County, Pennsylvania, on the night of her disappearance, and her severely beaten body was found the next day in a nearby church parking lot. The Commonwealth supported its case against Appellant with scientific evidence based on body fluids, testimony regarding Appellant's suspicious behavior toward Ms. Craig in the week preceding the crime, and incriminating statements made by Appellant to various persons, including a fellow inmate. After finding one aggravating circumstance (namely, that Appellant had committed the killing while perpetrating a felony, 42 Pa.C.S. § 9711(d)(6)) which outweighed any mitigating circumstances, the jury returned a verdict of death. Appellant filed post-verdict motions, which were denied, and the Court of Common Pleas of Delaware County ("the trial court") formally imposed the sentence of death.

Until this point Appellant had been represented by Samuel Stretton, Esq. ("trial counsel"). After filing a notice of appeal on Appellant's behalf, trial counsel was allowed to withdraw,

and the Delaware County Public Defender's Office ("appellate counsel") was appointed to represent Appellant.

On December 27, 1983, Appellant petitioned this Court to remand the case to the trial court for an evidentiary hearing on two issues: 1) trial counsel's alleged ineffectiveness in failing to present testimony from a mental health expert both to establish Appellant's diminished capacity and as a mitigating factor during sentencing; and 2) the manner in which the Delaware County District Attorney's Office determined whether to seek the death penalty in homicide cases. This Court granted the petition and remanded the case to the trial court on March 15, 1984. After several delays caused by the inability of the court-appointed psychiatrist to examine Appellant, the trial court scheduled the evidentiary hearing for February 20, 1985. However, while Appellant was being transported from the State Correctional Institution in Huntingdon to Delaware County for the hearing, he escaped. Upon petition of the Commonwealth, and because the hearing could not be held in Appellant's absence, the trial court returned the record to this Court so that consideration of Appellant's direct appeal could proceed.[1]

In December of 1986, after oral argument, this Court again remanded the case to the trial court for an evidentiary hearing, but directed that such hearing be limited to claims of ineffectiveness related to sentencing. After holding an evidentiary hearing as directed, the trial court dismissed Appellant's ineffectiveness claims. This Court affirmed the judgment of sentence in *Commonwealth v. Yarris,* 519 Pa. 571, 549 A.2d 513 (1988) (*"Yarris I"*), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 708 (1989).

The subsequent procedural history of the case is, as this Court has previously observed, "somewhat involved." *Commonwealth v. Yarris,* 543 Pa. 309, 311, 671 A.2d 218, 218 (1995) (*"Yarris II"*). Because it bears upon our review of the present appeal, we will summarize it here.

---

**1.** It is unclear when Appellant was returned to custody.

In February of 1989, the trial court permitted appellate counsel to withdraw from the case and appointed Scott D. Galloway, Esq. ("post-conviction counsel"), to represent Appellant.

At an undetermined point in 1989, Appellant purportedly filed a *pro se* document entitled "Motion for a New Trial for Newly Discovered Evidence and Unlawful/Intentional Destruction of Exculpatory Evidence," in which he argued that the Commonwealth had improperly withheld from the defense a pair of gloves found at the murder scene and had subsequently used the gloves at trial without first introducing them into evidence. This motion was not entered on the trial court docket, however, and neither the trial judge nor the District Attorney had any record of having received such a motion. Appellant subsequently filed with this Court a *pro se* petition for review asking that the trial court be compelled to act on the allegedly outstanding motion for a new trial. This Court quashed the petition for review upon motion of the Commonwealth.

Also in 1989, Appellant filed a petition for a writ of habeas corpus in the U.S. District Court for the Eastern District of Pennsylvania. The federal district court dismissed the petition on December 20, 1989, for failure to exhaust state remedies.

On January 4, 1991, post-conviction counsel filed, in the trial court, a motion for a new trial that was identical to Appellant's earlier, *pro se* motion of the same type. For reasons that are unclear, this motion was not docketed or acted upon by the trial court. Accordingly, Appellant refiled his petition for a writ of habeas corpus in the federal district court. As it had before, the district court dismissed the petition for failure to exhaust state remedies. Appellant appealed the dismissal to the Third Circuit Court of Appeals. On October 12, 1993, the Court of Appeals reversed and remanded the matter to the district court to determine whether there had been an unreasonable delay in the consideration of Appellant's claims by the trial court.

The Commonwealth responded to this development by petitioning the trial court to schedule a hearing on the claims raised in the motion for a new trial. In an order entered February 8, 1994, the trial court granted the Commonwealth's request and scheduled the hearing for April 6, 1994. The court also directed Appellant to file, within 10 days, a written statement specifying any other issues that he believed to be outstanding or that he desired to raise before the court, and to be prepared on April 6 "to proceed on every such issue."

Appellant did not file a statement specifying additional issues to be raised. At the hearing on April 6, 1994, post-conviction counsel requested a continuance on the grounds that he had been unable to communicate effectively with Appellant owing to Appellant's incarceration, and thus had just learned of certain witnesses whom Appellant wished to call. The trial court denied the request, noting that Appellant and his counsel had been given almost two months to prepare for the hearing and that the Commonwealth was prepared to call the witnesses requested by Appellant. The court also stated that the motion for a new trial should properly be considered a petition for relief pursuant to the PCRA. At the conclusion of the hearing, after having made clear that the only claims being decided at that time were those that had been raised in the motion for a new trial, the court concluded that Appellant had failed to prove that he was entitled to relief under the PCRA.

Appellant, through post-conviction counsel, appealed to this Court, arguing that the trial court had erred in denying the request for a continuance, in characterizing his motion for a new trial as a claim for relief under the PCRA, and in denying such motion.[2] On December 29, 1995, this Court affirmed the trial court in all respects. *See Yarris II.* The Court also made the following observation:

**2.** Then as now, exclusive jurisdiction of appeals from final orders denying post-conviction relief in capital cases was vested in this Court. 42 Pa.C.S. § 9546(d); *Commonwealth v. Morales,* 549 Pa. 400, 406, 701 A.2d 516, 519 (1997).

Although Appellant would have us believe that the trial court's ruling has foreclosed him from pursuing any future claims for relief under the PCRA, our review of the record belies such an implication. Notwithstanding the fact that Appellant was afforded the opportunity to raise any and all issues that he believed warranted relief, the court specifically stated that it was denying only the specific claims presented in Appellant's Motion for a New Trial[,] as evidenced by the [trial court's statement that "I'm ruling on what is here now, and that's it"].

*Id.* at 315 n. 8, 671 A.2d at 221 n. 8.

On December 16, 1996, Appellant, now represented by attorneys from the Center for Legal Education, Advocacy and Defense Assistance ("present counsel"), filed another petition for a writ of habeas corpus in the federal district court. Shortly thereafter, on January 10, 1997, Appellant filed the post-conviction petition that is now at issue.[3] The trial court heard argument on the issues raised in the petition, which it deemed to be Appellant's second such petition, and denied relief on June 19, 1998, without having held an evidentiary hearing.[4] This appeal followed.

## II. Status of the Present Appeal

We begin our analysis by addressing the procedural status of this appeal. First, we consider Appellant's contention that it was error for the trial court, at the hearing on April 6, 1994, to *sua sponte* deem his petition for a new trial to be a petition for relief pursuant to the PCRA.

This issue is no longer open to review. In *Yarris II*, Appellant argued, as he does here, that "the trial court erroneously characterized his Motion for a New Trial as a post conviction proceeding under the PCRA...." *Id.* at 314, 671

---

3. This document is captioned "petition for habeas corpus relief pursuant to Article I, Section 14 of the Pennsylvania Constitution and statutory post-conviction relief under 42 Pa.C.S. § 9542 *et seq.*"

4. Meanwhile, in June of 1997, the federal district court dismissed Appellant's petition for writ of habeas corpus without prejudice for failure to exhaust state remedies.

A.2d at 220. This Court concluded that Appellant had failed to demonstrate that the trial court's ruling was erroneous. That conclusion is the law of the case. The law of the case doctrine provides, in pertinent part, that "upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court. . . ." *Commonwealth v. Starr*, 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995). We may not depart from the law of the case doctrine unless confronted with exceptional circumstances, such as "where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Id.* at 575–76, 664 A.2d at 1332.

This exception does not apply here, as the prior holding was not erroneous. At the time that Appellant filed his petition for a new trial, his conviction and judgment of sentence had already been affirmed on appeal. Necessarily, then, the petition for a new trial was a post-conviction, collateral petition. By its own language, and by judicial decisions interpreting such language, the PCRA provides the sole means for obtaining state collateral relief. 42 Pa.C.S. § 9542; *Commonwealth v. Ahlborn*, 548 Pa. 544, 549–50, 699 A.2d 718, 721 (1997). Where, as here, a defendant's post-conviction claims are cognizable under the PCRA, the common law and statutory remedies now subsumed by the PCRA are not separately available to the defendant. *See Commonwealth v. Peterkin*, 554 Pa. 547, 551–55, 722 A.2d 638, 640–41 (1998) (concluding that because defendant's claims were cognizable under the PCRA, the statutory writ of habeas corpus was not separately available as to those claims). Accordingly, the trial court did not err in treating Appellant's motion for a new trial as a petition for relief pursuant to the PCRA.

## III. Timeliness

The PCRA petition filed on January 10, 1997, was, therefore, Appellant's second. Because the petition was filed after the effective date (January 16, 1996) of the 1995 amendments to the PCRA, it is governed by the PCRA as thus amended. *See Commonwealth v. Laird*, 555 Pa. 629, 639–41, 726 A.2d 346, 351 (1999) (noting that PCRA in effect at time of

filing of petition governs claims for relief). Under the amended PCRA, all petitions, including second and subsequent ones, must be filed within one year of the date on which the judgment became final, unless one of three statutory exceptions, discussed *infra*, applies. 42 Pa.C.S. § 9545(b)(1); *Peterkin*, 554 Pa. at 553, 722 A.2d at 641. This time limit is jurisdictional. *Id.* at 553, 722 A.2d at 641. Thus, an untimely petition will not be addressed simply because it is couched in terms of ineffectiveness, *id.* at 557, 722 A.2d at 643, or because it is filed in a capital case, *Commonwealth v. Banks*, 556 Pa. 1, 3, 726 A.2d 374, 375 (1999). Nor did this Court in *Yarris II* give Appellant permission to file a second petition without meeting the statutory requirements for doing so.

The judgment in the present case became final on June 16, 1989, the date on which the United States Supreme Court denied Appellant's petition for certiorari. 42 Pa.C.S. § 9545(b)(3). Appellant's second post-conviction petition was filed more than seven years later. The petition was therefore untimely unless Appellant is able to plead and prove that one of the following exceptions applies:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1).[5] A petition invoking any of these exceptions must be filed within 60 days of the date the claim could have been presented. 42 Pa.C.S. § 9545(b)(2).

---

5. The amended PCRA also provides that an appellant whose judgment has become final on or before the effective date of the act shall be

■■■■ Neither the parties nor the lower courts have discussed the timeliness of Appellant's second petition in general or the applicability of the Section 9545(b)(1) exceptions in particular. Because the timeliness implicates our jurisdiction, we may consider the matter *sua sponte. Commonwealth v. Saunders*, 483 Pa. 29, 32 n. 2, 394 A.2d 522, 524 n. 2 (1978); *Commonwealth v. Little*, 455 Pa. 163, 167, 314 A.2d 270, 272 (1974). Our consideration of the potential applicability of the statutory exceptions has, however, been rendered more difficult by the absence of any such discussion. Nevertheless, in light of the unique procedural history of this case, we have reviewed the seventeen broadly phrased issues raised by Appellant to determine whether they encompass any claims that should be considered timely under one or more of the exceptions set forth in Section 9545(b)(1). In doing so, we have been guided by the principle that the statutory language of the PCRA must be strictly adhered to. *See Commonwealth v. Pursell*, 555 Pa. 233, 252–54, 724 A.2d 293, 303 (1999) (stating that, in view of abandonment of relaxed waiver rule in PCRA appeals in capital cases, strict adherence to statutory language is required); *Commonwealth v. Albrecht*, 554 Pa. 31, 44, 720 A.2d 693, 700 (1998) (declaring that relaxed waiver rule will no longer apply in post-conviction appeals in capital cases).

Our review has identified several claims which, at first blush, may appear to qualify under one or more of the Section 9545(b)(1) exceptions. Careful analysis reveals, however, that none of those claims satisfy the statutory requirements for exemption from the one-year filing deadline.

## A. 42 Pa.C.S. § 9545(b)(1)(i): Exception Based on Interference by Government Officials

■■■■ With regard to the interference by government officials referred to in Section 9545(b)(1)(i), we note that the drafters of the 1995 amendments specifically excluded "de-

deemed to have filed a timely petition if his or her first petition is filed within one year of the effective date of the act. Section 3(1) of the Act of Nov. 17, 1995 (Spec.Sess. No. 1), P.L. 1118, No. 32; *Peterkin*, 554 Pa. at 553, 722 A.2d at 641. The petition at issue does not come within the terms of this exception because it is not Appellant's first.

fense counsel" from such officials. 42 Pa.C.S. § 9545(b)(4). Therefore, Section 9545(b)(1)(i) does not operate to save Appellant's claims of ineffective assistance of counsel from the bar of untimeliness.

 In his brief, Appellant alleges generally that "his efforts [to prove his innocence] have been hampered by prosecutorial misconduct in the handling, disclosure and destruction of evidence. . . . " [6] The precise contours of such alleged misconduct are difficult to discern from the brief, however. Appellant asserts as follows:

> From the pretrial period to the time this matter was pending in federal court, the defense was denied access to a complete copy of the homicide file. . . . In response to present counsel's request, in preparation for the filing of an amended federal petition, the District Attorney's Office finally provided some of what had been requested 14 years previously. What was revealed in that disclosure includes substantial *Brady* [7] material discussed herein.

Apparently the *Brady* material consisted, at least in part, of prior statements of witnesses, since Appellant subsequently asserts that "prior statements of witnesses . . . were destroyed and/or withheld." Appellant does not identify those witnesses, however, nor does he specify the alleged inconsistencies in pre-trial and trial testimony or how the assumed inability to exploit such inconsistencies affected the outcome of the trial. In sum, Appellant has identified no specific "claim" that he was unable to raise in a timely fashion because the District Attorney's Office prevented him from doing so.

 We reach the same conclusion with regard to the assertion that

---

**6.** To the extent that this allegation is intended to refer to the claims of withheld evidence that were addressed and found to be meritless in *Yarris II*, such allegation has been previously litigated and therefore cannot entitle Appellant to post-conviction relief. 42 Pa.C.S. § 9543(a)(3); *Commonwealth v. Howard*, 553 Pa. 266, 280–81, 719 A.2d 233, 240 (1998).

**7.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> Appellant's efforts to have [DNA] testing done by a reputable evaluator have been delayed through actions of the prosecutor prior to 1996. Evidence presented at a 1994 hearing established that slides containing biological evidence were lost or destroyed. The hearing also showed that the prosecutor failed to reveal, prior to or at the time of trial, that it had possession of the gloves allegedly worn by the killer. NT 4/6/94, 15–23. The Commonwealth's prior failure to disclose the existence of these gloves or slides violated Pennsylvania Rule of Criminal Procedure 305, severely hampered Appellant's ability to subject these materials to meaningful forensic evaluation and thereby violated Appellant's right to due process of law.

Appellant does not, and could not, maintain that the Commonwealth has somehow made DNA testing impossible. As the Commonwealth notes, DNA testing has already been performed at public expense, and the results were inconclusive.[8] Appellant concedes as much, but asserts without explanation that the laboratory that performed the testing was substandard. So vague and unsupported an allegation does not constitute a "claim" the timely presentation of which has been delayed by the District Attorney's Office within the meaning of Section 9545(b)(1)(i).

Finally, Appellant asserts in his brief, dated October 26, 1998, that further DNA testing is underway and that the trial court "improvidently" denied the present PCRA petition without waiting for the test results. The fact remains, however, that there is, as yet, no new DNA evidence and therefore no "claim" within the meaning of either Section 9545(b)(1)(i) or Section 9545(b)(1)(ii), *see infra.* Only in the event that Appellant should obtain favorable test results and plead and prove that such results could not have been obtained earlier, 42 Pa.C.S. § 9545(b)(1)(ii), and that they constitute "exculpatory evidence that has subsequently become available and would

---

8. At the hearing on April 6, 1994, the trial court observed that "[w]e granted the DNA testing. Unfortunately for Mr. Yarris it came back inconclusive. Not only did we have that testing, but we also had specialized refined testing of DNA material, and again, that came back inconclusive as far as I understand."

have changed the outcome of the trial if it had been introduced," 42 Pa.C.S. § 9543(a)(2)(vi), would Appellant avoid the time bar established in the PCRA.

**B. 42 Pa.C.S. § 9545(b)(1)(ii): Exception for After–Discovered Evidence**

■ Appellant contends that he has uncovered evidence showing that two Commonwealth witnesses, Charles Cataleno and Natalie Barr, testified falsely at Appellant's trial. According to Appellant, the affidavit of Virgil Weidman, dated December 14, 1996, establishes that Cataleno, a Commonwealth informant, lied when he testified that Appellant had confessed to the murder while the two men (Appellant and Cataleno) were incarcerated together. Mr. Weidman asserted in his affidavit that, while he was incarcerated in the Delaware County Prison at the same time as Appellant and Cataleno, Cataleno informed him that someone other than Appellant had murdered Linda Craig. Nevertheless, according to Weidman, Cataleno warned him away from Appellant because, in an effort to avoid a state prison sentence, he "was working on something in regard to [Appellant]." Weidman maintains that

I saw Nick [Appellant] when I was back in Delaware County Prison about 1985. Nick and I talked about what Cataleno had done to him. I told Nick I would call his attorney when I got out. When I was released I went straight to a diner close by and used the pay phone and called Nick's attorney and told him about what Cataleno had said to me. I also wrote letters trying to alert Nick's attorney to what Cataleno had said. I never heard from anyone on Nick's behalf until December, 1996.

Also offered to show the falsity of Cataleno's testimony is the statement of Arthur Johnson, who asserts that when he and Cataleno were incarcerated together in the State Correctional Institution at Pittsburgh, Cataleno admitted to having perjured himself at Appellant's trial. Mr. Johnson's statement is dated February 1, 1984.

The second Commonwealth witness who allegedly testified falsely was Natalie Barr. Ms. Barr had worked in the same

28

booth at the Tri–State Mall as the victim, Linda Craig. At trial, Ms. Barr identified Appellant as the man she had seen lingering around the booth in a suspicious manner in the days preceding Ms. Craig's death. Ms. Barr testified that several days after Ms. Craig's death, Appellant came to the booth and said, speaking of Ms. Craig, "I heard that she was raped." At that time, the fact that the victim had been raped was not public knowledge. *See Yarris I,* 519 Pa. at 583–84, 549 A.2d at 519.

To demonstrate the alleged falsity of Natalie Barr's testimony, Appellant offers the following affidavit, dated December 11, 1996, of James Weakland.

I spoke with and corresponded with Sue Barr from the summer of 1981 through about 1983.

During one of our phone conversations her cousin, Natalie Barr, got on the phone and I had a conversation with Natalie Barr.

Natalie asked me if I knew Nick Yarris. She told me she had testified against him at his death penalty trial.

Natalie said she felt very bad about her testimony against Nick. She said she was coached in her testimony. The detective told her what to say and how to say it. The detective told her what to say to be credible.

Natalie told me she felt like she had to do what the Detective told her to do because she was having a relationship with him and she was afraid if she didn't cooperate she would lose him.

Natalie asked me not to say anything to Sue or anyone else because she didn't want her family to know about the situation she was in.

Natalie told me she felt bad if she had done something to help Nick get the death sentence. Her testimony was given to her by the Detective. She told me she didn't realize how serious it was to give false testimony.

The next time I saw Nick I told him about this conversation[.] I wrote the details down and gave it to Nick. I

expected to be called to court to testify about this. I was never contacted by any attorney on Nick's behalf.

I am willing to testify about this matter now just as I have been willing to ever since it happened.

Appellant does not explain when or how he obtained these statements challenging the veracity of two Commonwealth witnesses. More important, he makes no attempt to explain why the information purportedly contained in these statements could not, with the exercise of due diligence, have been obtained much earlier. Ms. Barr allegedly confessed her perjury to Mr. Weakland no later than 1983, and Mr. Weakland conveyed this information to Appellant, both verbally and in writing, the next time he saw him.[9] Mr. Johnson's statement alleging Cataleno's perjury was made in 1984. Mr. Weidman stated that in 1985 he conveyed his knowledge of Cataleno's perjury to Appellant himself, and at some point thereafter to Appellant's attorney. In each of these instances, it appears that the information purportedly undermining the credibility of the Commonwealth witnesses was, or should have been, known to Appellant while his direct appeal was pending, and several years before the date on which the judgment in his case became final.

Accordingly, Appellant has failed to demonstrate that "the facts upon which the claim is predicated were unknown to [him] and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). In addition, he has failed to file post-conviction petitions based on these claims "within 60 days of the date the claim[s] could have been presented." 42 Pa.C.S. § 9545(b)(2). The untimeliness of these claims precludes their consideration.

**9.** Ms. Barr's reported admission that she perjured herself at the urging of a detective could be characterized not only as after-discovered evidence, but also as "interference by government officials." However, Section 9545(b)(1)(i) excuses untimeliness only where *"the failure to raise the claim previously* was the result of interference by government officials with the presentation of the claim ..."* (emphasis added). It is not alleged that this claim of perjured testimony, apparently made known to Appellant himself, could not have been raised previously due to the interference of government officials.

Appellant also contends that he has uncovered "credible and compelling evidence" that another man, Jay Jenkins, murdered Linda Craig. Appellant's evidence consists of two undated affidavits. The first affidavit is that of Agnes Sloss, a resident of the south Philadelphia neighborhood in which both Appellant and Jenkins grew up. In the affidavit, Ms. Sloss makes the following statement:

I do not remember exactly when but sometime after Mr. Yarris had been arrested, I was visiting with my neighbor Lydia Lee.... On this particular morning, Jay Jenkins came by Lydia's house and began speaking to us.

Jay told us that Nicholas Yarris was not responsible for the murder of the woman at the Tri–State Mall. Although I do not recall Jay's exact words, I do remember Jay said something like "I did it," meaning that he had killed the woman.

I cannot remember if Jay threatened to hurt us or our families if we told anyone that he was the one who killed that woman. Ever since my diabetes became bad and my leg was amputated, my memory has not been as good as it used to be. Sometimes I forget things and it is very possible that Jay, in addition to confessing the murder of the woman, threatened to hurt us if we told anyone else about his confession.

When Jay did live in the neighborhood, it was common knowledge that he was getting into trouble with the law. I know for a fact that he was arrested and jailed on one occasion. People used to say that because Jay's father worked for the Philadelphia police, Jay always managed to stay out of trouble. People also used to say that Jay was using a lot of drugs. I don't know whether that is right or wrong. Even if I know someone for a long time, I am not able to say if they are drunk on alcohol or high on drugs. Because of this, I would not have told Phyllis Wagner that when Jay made this confession to us he was high or drunk. I recall when the police came to my house and asked me questions about the statement that Jay made to us. My husband was still alive at that time.... I recall [him] being

surprised when he found out what the Detectives were questioning me about. Other than Phyllis Wagner, I never told anyone (including my husband and son) about Jay's confession, or the events that followed.

The second affidavit is that of Phyllis Wagner, a friend mentioned by Ms. Sloss in her affidavit, who averred that in the summer of 1990 Ms. Sloss told her about Jenkins' alleged confession but insisted that "she would not give this information to the police and if the police ever asked her about it she would deny that this conversation ever took place." Ms. Wagner goes on to say that

I thought about what Aggie [Ms. Sloss] had told me for over a year. Finally, . . . I decided to tell the authorities what I knew. In 1992 I wrote a letter to the District Attorney in Media[,] Pennsylvania. In it, I informed them of what Aggie had told me. Some time later, I was contacted by the District Attorney's office and was given an appointment to talk to two investigators. I met with them in the court-house in Media. The investigators hardly asked any questions. I was never advised to talk to Mr. Yarris' lawyers. After that meeting, I never heard about this again until I was contacted by Mr. Yarris' present counsel.

As was the case with his allegations of perjured trial testimony, Appellant has failed to explain when these affidavits were obtained and why the allegedly exculpatory information which they contain, which information was apparently disclosed to Ms. Sloss at some point following Appellant's arrest in 1982, could not have been discovered earlier.

Moreover, even if Appellant were able to surmount the bar of untimeliness with respect to this claim, he would then face the additional hurdle of proving by a preponderance of the evidence that one or both of the affidavits constitute "exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). On the record before us, Appellant could not satisfy such burden.

32

 Ms. Sloss' sworn statement as to Jenkins' out-of-court confession is hearsay. *Commonwealth v. Williams*, 537 Pa. 1, 26 n. 8, 640 A.2d 1251, 1263 n. 8 (1994). Accordingly, the statement is inadmissible unless it qualifies as an exception to the hearsay rule. One such exception, and the only one that even arguably applies in the present situation, is that for declarations against penal interest. See generally PACKEL AND POULIN, PENNSYLVANIA EVIDENCE § 804.3 (1987) (hereinafter PENNSYLVANIA EVIDENCE). On its face, Jenkins' reported confession to the crime of murder constitutes such a declaration. However, "[d]eclarations against penal interest are admissible as an exception to the hearsay rule only where there are existing circumstances that provide clear assurances that such declarations are trustworthy and reliable." *Id.* (citing *Commonwealth v. Bracero*, 515 Pa. 355, 528 A.2d 936 (1987) (plurality)); *see also* Pa.R.E. 804(b)(3) (stating, in pertinent part, that "[i]n a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement").

 There are no corroborating circumstances in the present case. Ms. Sloss was unable to recall the exact words of Jenkins' "confession"; she was able to offer only an approximation, "I did it." By her own admission, her memory was "not as good as it used to be." Nothing in her statement indicates how well Jenkins knew her and her neighbor, Lydia Lee; why Jenkins "came by" that morning; or why he chose to tell the two women that he had committed a murder that had been attributed to someone else. In addition, Ms. Sloss concedes that Jenkins was rumored to be a heavy drug user and that she would not have been able to tell whether he was under the influence of drugs when he "confessed" to the murder.[10]

10. We note, in this regard, that the "hasty and unguarded character which is often attached to confessions and admissions" is so well recognized that it serves as the basis for the *corpus delicti* rule. *Commonwealth v. Bardo*, 551 Pa. 140, 148, 709 A.2d 871, 875 (quoting *Commonwealth v. Turza*, 340 Pa. 128, 134, 16 A.2d 401, 404 (1940)), *cert. denied*, —— U.S. ——, 119 S.Ct. 350, 142 L.Ed.2d 289 (1998).

Appellant would undoubtedly argue that the affidavit of Ms. Wagner serves to corroborate the affidavit of Ms. Sloss. Ms. Wagner's statement adds nothing to the reliability of Jenkins' "confession," however. Moreover, Ms. Wagner's statement is hearsay within hearsay, or double hearsay: she recounts Ms. Sloss' disclosure to her of Jenkins' statement to Ms. Sloss. In order for double hearsay to be admissible, the reliability and trustworthiness of each declarant must be independently established. *Commonwealth v. Scott*, 503 Pa. 624, 630, 470 A.2d 91, 94 (1983). This requirement is satisfied where each statement comes within an exception to the hearsay rule. *See Commonwealth v. Galloway*, 302 Pa.Super. 145, 158–59, 448 A.2d 568, 575 (1982); Pennsylvania Evidence § 806. As previously noted, Jenkins' statement is not sufficiently trustworthy to qualify as a statement against penal interest, and we can conceive of no hearsay exception that would apply to Ms. Sloss' statement to Ms. Wagner.

We conclude that the evidence which purportedly reveals that someone other than Appellant committed the murder is hearsay, not within any exception, and so unreliable as to be inadmissible. A claim which rests exclusively upon inadmissible hearsay is not of a type that would implicate the after-discovered evidence exception to the timeliness requirement, nor would such a claim, even if timely, entitle Appellant to relief under the PCRA.

### C. 42 Pa.C.S. § 9545(b)(1)(iii): Exception for Newly Recognized Constitutional Rights

We have also reviewed Appellant's claims to determine whether he has asserted the violation of a constitutional right that was recognized by this Court or by the United States Supreme Court more than one year after Appellant's judgment became final on June 16, 1989, and which has been held to apply retroactively. Of Appellant's constitutionally based claims, the only one that rests upon a right recognized after June 16, 1990, is his assertion that, pursuant to *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), he was entitled to an instruction that if he were

sentenced to life imprisonment, he would not be eligible for parole. We have held, however, that *Simmons* does not apply retroactively on PCRA review. *Commonwealth v. Blystone*, 555 Pa. 565, 586–88, 725 A.2d 1197, 1208 (1999) (citing *Commonwealth v. Christy*, 540 Pa. 192, 217, 656 A.2d 877, 889 (plurality), *cert. denied*, 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995)).[11]

## IV. Conclusion

In sum, none of the claims raised by Appellant in this, his second appeal under the PCRA, fall within any of the exceptions stated in Section 9545(b)(1). Accordingly, because Appellant has failed to satisfy the requirements set by the legislature for the presentation of issues via a second or subsequent post-conviction petition, we affirm.

Chief Justice FLAHERTY concurs in the result.

11. Moreover, Appellant does not argue that his future dangerousness was at issue during the penalty proceeding. This Court has held that only in that circumstance is the defendant entitled to a *Simmons* instruction. *Commonwealth v. Speight*, 544 Pa. 451, 469, 677 A.2d 317, 326 (1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997).