

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-5-2002

# Whitney v. Horn

Precedential or Non-Precedential:

Docket 0-9003

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Whitney v. Horn" (2002). *2002 Decisions.* Paper 94.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/94

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 5, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-9003

RAYMOND WHITNEY

v.

MARTIN HORN, COMMISSIONER, PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; JAMES S. PRICE,
SUPERINTENDENT OF THE STATE CORRECTIONAL
INSTITUTION AT GREENE; AND JOSEPH
MAZURKIEWICZ, SUPERINTENDANT OF THE STATE
CORRECTIONAL INSTITUTION AT ROCKVIEW,

APPELLANTS

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 99-CV-1993
District Judge: Honorable Harvey Bartle, III

Argued: April 24, 2001

Before: McKEE, BARRY and AMBRO, Circuit Judges

(Opinion Filed: February 5, 2002)

        Counsel for the Appellants

        Thomas W. Dolgenos (Argued)
        Marilyn F. Murray
        Ronald Eisenberg
        Arnold H. Gordon
        Lynne Abraham
        1421 Arch Street
        Philadelphia, PA 19102

        Counsel for the Appellee

        Billy H. Nolas (Argued)
        Christina Swarns
        David Wycoff
        Defender Association of Philadelphia
        The Curtis Center -- Suite 545 West
        Independence Square West
        Philadelphia, PA 19106

OPINION OF THE COURT

McKEE, Circuit Judge.

A jury convicted Raymond Whitney of first degree murder
in state court, and sentenced him to death. We are now
asked to review the district court's grant of a writ of habeas
corpus under 28 U.S.C. S 2254. The district court
concluded that Whitney was entitled to habeas relief
because the trial judge erred in instructing the jury on the
defense of voluntary intoxication under Pennsylvania law.
For the reasons that follow, we will reverse and remand for
further proceedings consistent with this opinion.

I. Factual Background

At approximately 4:00 a.m. on October 10, 1981,
Whitney climbed through a second story window of the
apartment of Juliana Minor armed with a knife. Minor was
in bed when Whitney encountered her inside the
apartment. Whitney asked her if she recognized him, and
threatened to kill her if she did not keep quiet. She told
Whitney that she did not recognize him even though she
actually did recognize him from the neighborhood. When
Minor claimed she had no money, Whitney responded by
taking some valuables from her jewelry box and helping
himself to a can of beer from her refrigerator. Before
leaving, he cut the phone wire, unscrewed the mouthpiece
on the handset of her telephone, and removed the speaker
from inside the phone, thus rendering the phone
inoperable. Whitney then announced that he was in the

wrong apartment and left by climbing through a window back onto the ledge.

Moments later, he entered a neighboring second-floor apartment where a recently married couple, Mahin Murtaza and Jehad Taha, were sleeping. Upon being awakened by noise in their living room, Taha went to investigate. A few minutes later Murtaza heard someone strike Taha, and she called the police. While she was attempting to place the call, Taha reappeared in the bedroom with wounds on his chest and face. Whitney was standing behind him holding a knife to Taha's neck. Murtaza immediately hung up the phone although she had not been able to complete the call and summon police. Whitney angrily asked Murtaza why she was on the phone, and threw Taha on the bed.

As this was occurring, the phone rang. Whitney directed Murtaza to answer it and say that everything was fine. After she complied, Whitney grabbed the phone and hung up. The call had been a "callback" by a police operator who phoned the apartment because of the abrupt manner in which Murtaza's call ended.

Whitney then threatened the couple, demanded money and jewelry, and ripped pierced earrings from Murtaza's ears. He also threatened to rape Murtaza, and proceeded to tear off her brassiere. Taha gave Whitney jewelry; however, Whitney demanded more and ordered the couple to go to the living room where Murtaza's purse was located. When Taha refused Whitney's demand and instead went toward the bathroom, Whitney stabbed him again. Whitney then forced Taha into the living room where Murtaza emptied the contents of her purse onto the floor. However, Whitney was still not satisfied and expressed disappointment over the amount of money Murtaza had in her purse. After drinking some water from the refrigerator, Whitney hugged Murtaza, touched her on the breast, reiterated that he wanted to have intercourse with her, and then threw her to the floor. When Taha protested, Whitney stabbed him yet again, and told Murtaza, "[a]fter I kill him, then I am going to fuck you." Whitney then unfastened his pants and pulled out his penis. Taha tried to stop Whitney, and a scuffle ensued during which Whitney repeatedly told Taha, "I'm going to kill you." However, the scuffle provided Murtaza with an

3

opportunity to run for help, and she ran from the apartment into the street. Once outside, she encountered two police officers who ran back to her apartment with her. They entered in time to see Whitney crouched over Taha, pulling a knife out of Taha's chest. They immediately arrested Whitney.1 However, Taha had already sustained twenty-four stab wounds, and he died soon after being taken to a hospital.

In a post-arrest statement, Whitney contended that earlier that evening he left a bar and ran into an acquaintance. He admitted that he had thereafter entered a second-floor apartment in the 3400 block of Powelton Avenue, and that he had struggled with and assaulted, a man. He told police that he "wasn't drunk then.[He] only had a little to drink," and did not recall any stabbing.

Defense counsel moved to suppress Whitney's statement, Minor's identification, and physical evidence that had been seized from Whitney following his arrest. The motion was denied, and Whitney was tried before a jury on charges that included first degree murder and burglary.

Ms. Minor and Ms. Murtaza testified for the Commonwealth at Whitney's trial. Minor testified that Whitney "walked funny," that he was "woozy," and that his speech was "funny" during the incident. Her testimony therefore provided some evidence that he had been intoxicated when he stabbed his victim. In addition, on cross-examination, the officer who transported Whitney to police headquarters testified that Whitney's breath smelled of alcohol.

The Commonwealth's case-in-chief included six witnesses who testified that they had not observed evidence of Whitney's intoxication from 4:00 a.m. on. Although Whitney did not testify, he called three defense witnesses who testified that he had been drinking at a party into the early

_____

1. In a search pursuant to the arrest, police recovered several items Whitney had stolen from both apartments. Police also seized Whitney's blood-stained clothing and a knife. Subsequent laboratory analysis confirmed the presence of blood on both the knife and Whitney's clothing. That blood was consistent with Taha's blood type.

morning hours of October 10th. Whitney also introduced evidence of three hospitalizations from alcohol overdoses between 1973 and 1976. In rebuttal, the Commonwealth produced additional evidence of Whitney's sobriety on the night of the murder.

The jury convicted Whitney of first degree murder, two counts of robbery, two counts of burglary, attempted rape, indecent assault, terroristic threats, and two counts of possession of an instrument of crime. Whitney called one witness during the ensuing penalty phase, and the jury thereafter imposed the death sentence. After post-verdict motions were denied, the trial judge formally imposed sentence.

## II. Procedural Background

Whitney was represented by trial counsel on direct appeal to the Pennsylvania Supreme Court.[2] In that appeal he raised the following issues:

> (1) the verdict was against the weight of the evidence which established Whitney's diminished capacity due to intoxication and negated his intent to commit first degree murder;[3]
>
> (2) the trial court erred in denying a motion to suppress his statement because he lacked the requisite mental capacity to make an intelligent, informed, knowing and voluntary waiver of his Miranda rights;
>
> (3) the prosecutor was guilty of misconduct in his penalty phase summation; and

_____

2. Appeal directly to the Pennsylvania Supreme Court is permissible when a defendant has received the death penalty. See 42 Pa. C.S. SS 9711(h)(a) and 722(4).

3. Although Whitney only challenged the weight of the evidence, the Pennsylvania Supreme Court addressed both the weight of the evidence and the sufficiency of the evidence in its opinion, noting that the court routinely examines the sufficiency of the evidence to sustain the first degree murder conviction in death penalty cases. See Commonwealth v. Whitney, 512 A.2d 232, 236 (Pa. 1986) (citing Commonwealth v. Zettlemoyer, 500 Pa. 16, 26-27 n.3 (1982)).

5

>    (4) various defects in the Pennsylvania death penalty
>        statute.

On July 15, 1986, the Pennsylvania Supreme Court affirmed Whitney's conviction and upheld his death sentence. See Commonwealth v. Whitney, 511 Pa. 232, 512 A.2d 1152 (1986).4 On September 25, 1990, Pennsylvania's governor signed a warrant for Whitney's execution.

On November 13, 1990, Whitney filed a pro se collateral petition under Pennsylvania's Post Conviction Relief Act, 42 Pa. C. S. S 9501 et seq. (the "PCRA"), and his execution was stayed until counsel could be appointed. Thereafter, Whitney filed four amended petitions in which he alleged ineffective assistance of counsel at trial and on direct appeal.5 An evidentiary hearing was held on Whitney's PCRA claims on February 1, 1993. Whitney testified at that hearing as did his aunt and cousin. They testified in support of Whitney's claim that trial counsel should have presented their testimony in mitigation at the penalty phase. Whitney's trial counsel did not, however, testify at the PCRA hearing. The PCRA court denied relief on January 3, 1995, and Whitney appealed to the Pennsylvania Supreme Court. He argued that trial counsel had been ineffective in failing to:

>    (1) advise Whitney of his right to testify, call him to
>        testify at trial concerning, inter alia, his intoxicated
>        state, or call him to testify at the penalty phase;
>
>    (2) comply with his purported intention to be tried by
>        a trial judge and not a jury;
>
>    (3) call a physician to testify at the guilt phase to
>        support a claim of diminished capacity;
>
>    (4) object when Sergeant Robert Wagner testified that
>        Whitney maintained silence at the time of his
>        arrest;

_____

4. Whitney apparently did not file a petition for writ of certiorari in the United States Supreme Court.

5. The petitions were dated March 8, 1991, September 23, 1991, December 17, 1991, and June 4, 1992.

(5) present evidence of an absence of a significant history of criminal convictions at the penalty phase;

(6) present evidence of his age of twenty-two years at the time of the murder as a mitigating circumstance at the penalty phase;

(7) object to jury instructions and the verdict slip at the penalty phase because they violated Mills v. Maryland, 486 U.S. 367 (1988);

(8) object to the jury instructions at the penalty phase because the term "torture" was not defined; and

(9) call his aunt and cousin as witnesses to the penalty phase.

While his appeal was pending before the Pennsylvania Supreme Court, Whitney filed a second pro se PCRA petition. It was dismissed without prejudice on August 4, 1997, because Whitney's appeal of the dismissal of his first PCRA petition was still pending before the Pennsylvania Supreme Court. Approximately six months later, on February 26, 1998, the Pennsylvania Supreme Court affirmed the denial of PCRA relief. See Commonwealth v. Whitney, 550 Pa. 618, 708 A.2d 471 (1998), and in April 1999, the governor signed another warrant for Whitney's execution.6 The execution was scheduled for June 3, 1999.

Whitney then sought relief in federal court. The district court initially granted a stay of execution on April 22, 1999. On May 6, 1999, Whitney, through counsel, filed a petition requesting federal habeas relief under 28 U.S.C.S 2254. He argued that he was entitled to a writ of habeas corpus based upon each of the following:

I. the prosecutor's penalty phase argument was improper;

II. trial counsel did not render effective assistance because he failed to investigate and present mitigating evidence and presented a harmful closing argument;

_____

6. Whitney did not file a petition for certiorari in the United States Supreme Court.

7

III. Whitney's statement was improperly admitted at trial because his alleged mental impairments rendered him unable to make a knowing and intelligent waiver of his Miranda rights;

IV. the trial court failed to properly instruct the jury on the nature and use of aggravating and mitigating circumstances in violation of the Eighth and Fourteenth Amendments;

V. the Commonwealth used peremptory challenges to exclude African American potential jurors in violation of Batson v. Kentucky, 476 U.S. 79 (1986) and Swain v. Alabama, 380 U.S. 202 (1965);

VI. the trial court gave an inaccurate and misleading voluntary intoxication instruction, trial counsel ineffectively failed to object and to present all of the available evidence of petitioner's intoxication, and the Commonwealth presented insufficient evidence of petitioner's capacity to form the specific intent required for first degree murder;

VII. the trial court erred in failing to give a life without possibility of parole instruction to the jury;

VIII. the sentencing phase jury instructions indicated that mitigating circumstances had to be found unanimously, in violation of Mills v. Maryland, 486 U.S. 367 (1988);

IX. the aggravating circumstance of torture was improperly applied to him;

X. the aggravating circumstance of "knowingly creat[ing] a grave risk of death to another person in addition to the victim" was improperly applied to him;

XI. the Commonwealth was improperly permitted to introduce testimony that Whitney used an alias;

8

XII. a Commonwealth witness testified about
Whitney's post-arrest and post-Miranda silence
in violation of the Fifth, Eighth, and Fourteenth
Amendments;

XIII. trial counsel did not render effective assistance
because he failed to advise Whitney of his right
to testify;

XIV. trial counsel did not render effective assistance
because he failed to investigate, develop and
present evidence of Whitney's innocence of first
degree murder;

XV. the state supreme court's arbitrary
proportionality review denied him due process
and rendered his death sentence
unconstitutional under the Eighth Amendment;

XVI. his death sentence violated various
constitutional provisions because it was the
result of racial discrimination;

XVII. all state court counsel did not render effective
assistance when they failed to raise and/or
litigate the issues discussed in the habeas
petition; and

XVIII. he is entitled to relief because of the cumulative
prejudicial effect of the errors alleged in his case.[7]

On May 22, 2000, the district court held a hearing to
resolve outstanding issues of exhaustion and procedural
default. The court also received evidence pertaining to
claims II, V, VI, VIII, and XII. Whitney's counsel noted that
the Pennsylvania legislature had enacted the time bar for
filing PCRA petitions under 42 Pa. C.S.A. S 9545(b)(1) while
Whitney's appeal from the denial of PCRA relief was
pending in the Pennsylvania Supreme Court. When his
appeal was finally decided in February 1998, the time for

_____

7. The Commonwealth had urged dismissal of Whitney's petition under
Rose v. Lundy, 455 U.S. 509, 510 (1982), because it contained
exhausted and unexhausted claims. Whitney thereafter filed an amended
habeas petition deleting claim XVI. He apparently decided to pursue
claim XVI in state court.

9

filing another PCRA petition containing new claims had already expired. Therefore, argued counsel, Whitney's failure to assert his habeas claims in another PCRA petition should not preclude federal review of the merits of his habeas claims. Counsel also argued that, until November 1998, the Pennsylvania Supreme Court had observed a "relaxed waiver" policy in cases involving the death penalty. Under that policy, the court entertained all claims raised by capital defendants, even though the claims may not have been properly preserved or were procedurally barred. Moreover, the Pennsylvania Supreme Court often reviewed such claims even though they were asserted in PCRA petitions that did not meet the time restrictions of 42 Pa. C.S.A. S 9545(b)(1). Thus, counsel argued, after the Pennsylvania Supreme Court announced that the time bar was jurisdictional, see Commonwealth v. Banks , 556 Pa. 1 (1999), and that it would no longer observe the relaxed waiver rule, see Commonwealth v. Albrecht, 722 A.2d 638 (Pa. 1998), any petition filed by Whitney would have been untimely. Habeas counsel therefore, argued that the PCRA time bar was not an adequate and independent state procedural bar precluding federal review of the claims which Whitney had not presented in the state courts.

The court accepted Whitney's procedural default argument. The court concluded that, although Whitney had not presented most of his federal habeas claims to the state courts, exhaustion should be excused, and that the PCRA time bar was not an adequate and independent state ground for denying Whitney relief.

The district court then proceeded to the merits of Whitney's challenge to the trial court's instruction on voluntary intoxication, and his claim that trial counsel rendered ineffective assistance in failing to object to it (claim VI). The substance of that jury instruction is set forth later in our discussion. For now, we simply note that the trial judge misstated the Commonwealth's burden of proving specific intent to kill in Pennsylvania when a defendant introduces evidence of voluntary intoxication. The district court concluded that the trial court's misstatement created a substantial possibility that Whitney's jury based its findings on an unconstitutional

10

ground, and that relief was therefore required under Mills v. Maryland, 486 U.S. 367, 381 (1988). The district court explained: "We have no way of knowing whether one or more jurors found he was too drunk to form the specific intent to kill and then relied on the incorrect voluntary intoxication instruction in finding him guilty of first degree murder, or whether they all believed that he had the specific intent to kill and then relied upon the earlier correct instruction in convicting him." Dist. Ct. Op. at 19. The district court was appropriately concerned with ascertaining with "even greater certainty" that a death sentence rests on proper grounds. Id. at 20.

The district court also concluded that there was a"plain and serious deficiency" in trial counsel's failure to object to the charge. The court therefore held that Whitney had met the first prong for establishing ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). The court also found that Whitney had been prejudiced by the error based upon the court's conclusion that there was a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. The court found a sufficient possibility that at least one juror would not have voted to convict Whitney of first degree murder if the court had correctly explained that evidence of voluntary intoxication could negate the mens rea required for a conviction of first degree murder. Id. at 21. The district court granted the writ of habeas corpus on that basis and did not reach any of the other grounds for relief that Whitney asserted in his habeas petition.

This appeal followed.

III. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. SS 1291, 2253(a). The district court's determination of whether an issue has been exhausted is subject to plenary review. See Shandelmeier v. Cunningham, 819 F.2d 52 (3d Cir. 1986) (citing Sullivan v. Cuyler, 723 F.2d 1077, 1082 (3d Cir. 1983)). We also exercise plenary review over the district court's legal conclusions, but we review the court's factual

11

conclusions under a clearly erroneous standard. See
Lambert v. Blackwell, 134 F.3d 506, 512 (3d Cir. 1997)
(citing Caswell v. Ryan, 953 F.2d 853, 857 (3d Cir. 1992));
Bond v. Fulcomer, 864 F.2d 306, 309 (3d Cir. 1989)).8

IV. Discussion

A. Exhaustion and Procedural Default

A state prisoner must "fairly present" all federal claims to
the highest state court. See 28 U.S.C. S 2254(b), O'Sullivan
v. Boerckel, 526 U.S. 838, 842 (1999); see also Picard v.
Connor, 404 U.S. 270, 275 (1971) (state courts should have
an opportunity to pass upon and correct alleged errors).
Whitney did not raise his challenge to the trial court's
instruction on intoxication at any level in the state courts.10
Whitney has, therefore, failed to exhaust his claim. See
O'Sullivan, 526 U.S. at 845.11 However, we "excuse" a
failure to exhaust "if it is clear that [the habeas petitioner's]
claims are now procedurally barred under [state] law." Gray

_____

8. Whitney's habeas petition was filed after the Antiterrorism and
Effective Death Penalty Act ("AEDPA") became effective. However,
because the issue here is the procedural bar, and the state courts never
had the opportunity to address Whitney's challenge to the voluntary
intoxication jury instruction or counsel's ineffectiveness in failing to
object, we do not apply the restrictive standard of review contained in 28
U.S.C. S 2254(d), as amended by AEDPA.

10. Whitney's claim, as he presented it in his amended habeas petition,
was essentially threefold: (1) the trial court gave an inaccurate and
misleading voluntary intoxication instruction, and previous counsel
rendered ineffective assistance for failing to challenge the error; (2)
trial
counsel ineffectively failed to present all of the available evidence of
petitioner's intoxication; and (3) the Commonwealth presented
insufficient evidence of petitioner's capacity to form the specific intent
required for first degree murder. The district court only reached the
first
part of the claim, and the appellants have only challenged that ruling on
appeal.

11. On May 9, 2000, the Pennsylvania Supreme Court issued an order in
In re: Exhaustion of State Remedies in Criminal and Post-Conviction Relief
Cases, No. 218 Judicial Administration Docket No. 1, declaring that
federal habeas petitioners no longer have to appeal to the state supreme
court. See Wenger v. Frank, 266 F.3d 218, 225 (3d. Cir. 2001).

12

v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074, 2080 (1996). See 28 U.S.C. S 2254(b)(1) (2001). We have explained:

> `Futility' exists where: a state's highest court has ruled unfavorably on a claim involving facts and issues materially identical to those undergirding a federal habeas petition and there is no plausible reason to believe that a replay will persuade the court to reverse its field, where the state provides no means of seeking the relief sought, or where the state courts have failed to alleviate obstacles to state review presented by circumstances such as the petitioner's pro se status, poor handwriting and illiteracy.

Lines v. Larkins, 208 F.3d 153, 162–63 (3d Cir. 2000) (citations and quotations omitted). However, state procedure must "clearly foreclose" state court review of the unexhausted claims. See Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993); Doctor v. Walters, 96 F.3d 675, 681 (3d Cir. 1996). The mere fact that it is unlikely that further state process is available is insufficient to establish futility. See Lines, 208 F.3d at 163 (citing Gibson v. Scheidemantel, 805 F.2d 135, 141 (3d Cir. 1986)).

The parties here agree that Whitney must attempt to file yet another PCRA petition if he is now to assert his claims in state court. See Commonwealth v. Ahlborn, 699 A.2d 718, 721 (Pa. 1997) (noting that in Pennsylvania, the PCRA is the "sole means for obtaining [collateral] relief and . . . supersedes common law remedies"). However, as Whitney points out in his brief, the parties also agree that that would be a useless exercise because any such petition would be dismissed as untimely under 42 Pa. C.S.A. S 9545(b)(1). See Appellee's Br. at 10.

Section 9545(b)(1) provides:

> Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
> (i)  the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim . . .

13

> (ii)  the facts upon which the claim is predicated
> were unknown to the petitioner and could not
> have been ascertained by the exercise of due
> diligence; or
>
> (iii) the right asserted is a constitutional right that
> was recognized by the Supreme Court of the
> United States or the Supreme Court of
> Pennsylvania after the time period provided in
> this section and has been held by that court to
> apply retroactively.

Id. A conviction becomes final for PCRA purposes "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." Lines, 208 F.3d at 164 (quoting Commonwealth v. Banks, 556 Pa. 1, 726 A.2d 374, 375 (1999)).12 It is now clear that this one-year limitation is a jurisdictional rule that precludes consideration of the merits of any untimely PCRA petition, and it is strictly enforced in all cases, including death penalty appeals. See Commonwealth v. Peterkin, 722 A.2d 638, 642 (1998) (affirming the denial of a second PCRA petition as time barred, and holding that no exception could be made for a capital defendant); see also Banks, 726 A.2d at 376 (same, noting that "[t]he Legislature has spoken on the requisites of receiving relief under the PCRA and has established a scheme in which PCRA petitions are to be accorded finality. The gravity of the sentence imposed upon a defendant does not give us liberty to ignore those clear mandates.").13

_____

12. See 42 Pa. C.S.A. S 9545(b)(3).

13. In Banks v. Horn, 126 F.3d 206 (3d Cir. 1997), we observed that the PCRA waiver rules had not been consistently applied in capital cases, and held that we could not determine whether further avenues of state court review would be "clearly foreclosed" under the PCRA waiver provisions with respect to a claim raised in a successive PCRA petition in a capital case. We therefore dismissed the claim as unexhausted to allow the petitioner to return to the state courts. However, as noted above, the Pennsylvania Supreme Court has since held that it will no longer relax procedural requirements in capital cases. Accordingly, PCRA petitioners who have received the death penalty are held to the same

14

A claim in a PCRA petition that trial counsel and
previous post-conviction counsel were ineffective for failing
to raise an issue is also subject to the time bar.
Commonwealth v. Yarris, 731 A.2d 581, 586 (Pa. 1999)
(holding that the time limit is jurisdictional, and an
untimely petition would not be addressed simply because it
is couched in terms of ineffectiveness of counsel or because
it is filed in a capital case); Commonwealth v. Lark, 560 Pa.
487, 746 A.2d 585, 589-90 (2000) (holding that, even where
a claim of ineffectiveness was asserted at earliest stage of
proceedings, an allegation of ineffectiveness is not sufficient
to overcome otherwise untimely claims).

Whitney's conviction became final on October 15, 1986.14
We are now well beyond the limitation period for filing
PCRA petitions. Thus, absent one or more of the exceptions
set forth in S 9545(b)(1), any PCRA petition that Whitney
might now attempt to file would be untimely and
unreviewable in the Pennsylvania courts, see
Commonwealth v. Beasley, 559 Pa. 604, 741 A.2d 1258,
1261 (1999), as none of the statutory exceptions to the time
bar apply here.15

_____

procedural requirements as all other PCRA petitioners. See Albrecht, 720
A.2d 693; Fahy v. Horn, 240 F.3d 239, 245 (3d Cir. 2001). Moreover, the
jurisdictional nature of the PCRA's filing deadlines is now clear. Fahy at
245 (citing Banks, supra). See also Commonwealth v. Basemore, 560 Pa.
258, 744 A.2d 717, 726 (2000).
14. This was ninety days after the Pennsylvania Supreme Court affirmed
his sentence, which was at the expiration of the time for filing a
petition
for writ of certiorari with the United States Supreme Court.
15. Whitney does not allege governmental interference, nor does he argue
a new retroactive rule of constitutional law. Furthermore, Whitney's
challenge to the jury instruction and his assertion that previous counsel
were ineffective for failing to raise the error do not constitute claims
of
after discovered evidence. See, e.g., Commonwealth v. Gamboa-Taylor,
562 Pa. 70, 753 A.2d 780, 785-786 (2000) (subsequent counsel's review
of previous counsel's representation and conclusion that previous
counsel was ineffective is not newly discovered"fact" encompassed in the
exceptions); Commonwealth v. Pursell, 561 Pa. 214, 749 A.2d 911, 915
(2000) (same). Moreover, even if Whitney's claim amounted to after-
discovered evidence under the PCRA, Whitney would still have had to file
his PCRA petition within 60 days of the date that the new evidence was
discovered, and the sixty-day deadline has long passed. 42 Pa. C.S.A.
S 9545(b)(2).

15

Accordingly, inasmuch as the Pennsylvania courts would lack jurisdiction over any post-conviction petition that Whitney might now file, he is "clearly foreclosed" from attacking the jury instruction in state court. See Toulson, 987 F.2d at 988-89. This does not, however, mean that the district court properly reached the merits of Whitney's claim. In Lines we stated:

> It does not necessarily follow, however, that Lines is entitled to an adjudication of the merits of his unexhausted federal habeas claims merely because it is now futile to attempt to raise them in state court. A finding of futility merely eliminates the procedural pretense of requiring a federal habeas petitioner to return to an unavailable state forum for nonexistent relief. Futility, without more, does not mean that the federal courts may proceed to the merits of the petitioner's claims.

Lines, 208 F.3d at 166.

The parties here continue to argue over the proper interpretation, application, and reach of Lines . Accordingly, we take this opportunity to reiterate: "claims deemed exhausted because of a state procedural bar are procedurally defaulted." Id. at 160 (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)) (quotations omitted).16 In Lines, the very same PCRA time limit barred the petitioner from filing a second PCRA petition. Based upon the futility of requiring Lines to cure his procedural default, we considered his claims exhausted because

_____

16. In McCandless, 172 F.3d at 260, we explained:

> When a claim is not exhausted because it has not been "fairly presented" to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion
> requirement is satisfied because there is "an absence of available State corrective process." 28 U.S.C. S 2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse his or her default.

Id. (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).

16

" `there [were] no state remedies available to him.' " Lines, 208 F.3d at 166 (quoting Coleman v. Thompson, 501 U.S. 722, 732). We thus concluded that, "[w]hen exhaustion is futile because state relief is procedurally barred, federal courts may only reach the merits if the petitioner makes the standard showing of `cause and prejudice' or establishes a fundamental miscarriage of justice." Id. (citing Caswell v. Ryan, 953 F.2d 853, 861 (3d Cir. 1992)).

In Lines, we undertook a procedural default analysis of cause and prejudice without providing a detailed analysis of whether Pennsylvania's time limit was an adequate or independent state rule for denying relief. Id.  Here, the district court determined that the time limit for filing PCRA petitions did not constitute an adequate and independent state ground precluding federal review. Perhaps because of this, both the Commonwealth and Whitney devote an inordinate amount of time in their briefs arguing about whether an adequate and independent state ground precludes granting Whitney federal habeas relief given his procedural default.

Whitney acknowledges that Lines discusses the very state procedural rule at issue here, but he argues Lines must be distinguished because it was not a capital case, and because we did not discuss the adequate state ground requirement there. Appellee's Br. at 50. We are unimpressed with Whitney's attempt to distinguish Lines as a non-capital case. As noted above, the distinction is no longer valid for purposes of the application of the PCRA's time bar as it pertains to issues of exhaustion and futility. See Peterkin, 722 A.2d at 642-43; Commonwealth v. Yarris, 731 A.2d at 586. Accordingly, the procedural default analysis in Lines is indistinguishable from that which we must undertake here. Moreover, nothing in the holdings of the Supreme Court or in the text of 28 U.S.C. S 2254 suggests that the exhaustion requirement for defendants sentenced to death is different for those defendants who receive a lesser sentence. Accordingly, we must determine if Whitney can establish cause and prejudice for his procedural default.

As noted above, Whitney's cause and prejudice argument is intertwined with the merits of his Sixth Amendment and

due process claims. He argues that trial counsel was ineffective for failing to object to the jury charge on voluntary intoxication, and that counsel's failure to recognize the merits of this argument in state court constitutes ineffective assistance of counsel and demonstrates the cause and prejudice necessary to excuse the procedural default. See Coleman v. Thompson , 501 U.S. at 750 ("Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the state, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to the state interests that federal habeas review entails.").17 We will begin the inquiry into counsel's stewardship by determining if the jury charge was defective.

B. Was The Jury Instruction Erroneous?

Whitney was convicted of first degree murder pursuant to 18 Pa. C.S.A. S 2502. Section 2502 states in relevant part: "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." Under Pennsylvania law, the Commonwealth had to establish beyond a reasonable doubt that Whitney "[had] the specific intent to kill . . . and [was] conscious of his own intention." Commonwealth v. Hannibal, 562 Pa. 132, 140 (Pa. 2000). A killing in Pennsylvania is with the "specific intent to kill if it is willful and deliberate." Id. However, Pennsylvania recognizes that someone can be intoxicated to such an extent that he/she is not capable of forming a specific intent to kill. Commonwealth v. Graves, 461 Pa. 118 (1975).

Given the aforementioned evidence of intoxication, the trial court charged the jury on the possible effect of voluntary intoxication upon Whitney's mens rea. Inasmuch

_____

17. Whitney and the Commonwealth also argue over whether Pennsylvania's relaxed waiver rule for capital cases may constitute "cause" for Whitney's procedural default. However, it is not necessary for us to answer that question here because we conclude that Whitney can not make the threshold showing of prejudice. See Frady, 456 U.S. 152, 167 (1982) (finding it unnecessary to determine whether petitioner had demonstrated cause, because he had not suffered actual prejudice sufficient to justify collateral relief).

18

as that charge is the sole basis for the disputed relief, we will quote the relevant portions at length. The trial court instructed the jury:

With one exception, which I will define later, voluntary intoxication is not a defense to a criminal charge. A person who uses intoxicants cannot become so drunk that he is, for that reason, legally incapable of committing a crime.

Among the elements of the crime of burglary, attempted rape, possession of an instrument of crime and terroristic threats is that the defendant had a certain criminal intent with respect to each of these crimes at the time they were committed. . . .

However, in terms of being found guilty, a defendant cannot ordinarily be found guilty of the crimes involved here unless he had the required state of mind--that is, the intent to commit the crime, the criminal intent--at the time of the alleged crime.

However, in the case of a voluntarily intoxicated defendant, it is not necessary that the defendant be conscious or aware of his own state of mind. It is enough if the required mental state is present somewhere in his drunken mind or expressed in his acts.

Thus, if you are satisfied beyond a reasonable doubt that the defendant committed particular crimes as I have defined before in my instructions, you should find him guilty of those crimes, even though you believed he was intoxicated at the time.

However, as I indicated a few moments ago, the general rule is that voluntary intoxication is not a defense to a criminal charge. However, there is one modifying circumstance to that rule which says that the voluntary use of intoxicants does not preclude a person from being legally capable of committing a crime. The qualification is where the crime which is charged is first degree murder.

In connection with that crime, the defendant is permitted to claim, as a defense, that he was so drunk

19

at the time of the killing that he did not possess the specific intent to kill required for first degree murder. The Commonwealth has the burden of disproving this defense.

Thus you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant was not so intoxicated at the time that he was incapable of judging his acts and their consequences or being capable of forming a willful, deliberate and premeditated design to kill.
Now, let me repeat that again for you.

The Commonwealth has the burden of disproving this defense.

Thus, you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant was so intoxicated at the time that he was incapable of judging his acts and their consequences or incapable of forming a willful, deliberate and premeditated design to kill.

Voluntary intoxication may reduce a crime of murder from first degree, to third degree. Voluntary intoxication, however, is no defense to a charge of second or third degree murder or of voluntary manslaughter, nor, as I indicated earlier, is it a defense to any of the other crimes with which this defendant is charged. . . .

Appellants App. at pp. 786-89 (emphasis added). All agree that the italicized portion of the charge is incorrect and that "was" and "so" should have been separated by "not." The Commonwealth has argued at several points during the proceedings that the error is probably only one of transcription. However, there is nothing in the record to support such a blase assertion, and we obviously can not decide this case on the basis of that unsupported argument.

Because the misstatement of law concerns the very defense which may negate the specific intent required for murder in the first degree, it is potentially a substantial

20

error. The Commonwealth cites to Henderson v. Kibbe, 431 U.S. 145, 153 (1977), in arguing that this single defect did not rise to the level of constitutional error when considered in context with the charge as a whole. Despite the"slip of the tongue," argues the Commonwealth, the trial court properly instructed that voluntary intoxication can negate the necessary specific intent and reduce a homicide to third degree murder. The Commonwealth reminds us that the trial court twice instructed the jury that the prosecution shouldered the burden of disproving voluntary intoxication. In Henderson, supra, the Court found that the state court's omission of an instruction regarding causation in a murder instruction was not a constitutional error requiring habeas relief because, taken as a whole, the challenged instruction sufficiently informed the jury about the element of causation. Id.

However, that is quite different from what occurred in Whitney's case. Here, the law regarding specific intent was explained elsewhere in the jury instruction--in the description of different degrees of murder given approximately thirty pages before the voluntary intoxication instruction (Appellants App. at p. 747–51). That law was also correctly explained after the faulty instruction when the court answered a specific jury question about the degrees of murder, and the elements of burglary, and robbery. 808–21.

However, the law on voluntary intoxication insofar as it applies to the charge of first degree murder was explained only at the single instance quoted above. That instruction concluded with a misstatement of the law. There is no question that this instruction would have been critical to a juror's understanding of the law of voluntary intoxication. It was the only time that the legal consequences of intoxication with respect to specific intent to kill were explained. Cf. Humanik v. Beyer, 871 F.2d 432, 441 (3d Cir. 1989) (finding that, where there was no other language in instruction to dilute express instruction that defendant had the burden of proving by a preponderance of the evidence that he had mental disease or defect that negated the intent to kill, burden of proof was impermissibly shifted to defendant).

21

The Commonwealth notes that the trial court gave the correct instruction for voluntary intoxication immediately before repeating the instruction in which it omitted"not." It also argues the court instructed the jury that "[v]oluntary intoxication may reduce the crime of murder from first degree, to third degree," immediately after the incorrect instruction. App. Appendix Vol. III, at 789. However, while a single defect does not necessarily make an instruction erroneous, see Henderson, a defect in a charge may result in legal error if the rest of the instruction contains language that merely contradicts and does not explain the defective language in the instruction. See Francis, 471 U.S. at 322; see also United States v. Hernandez, 176 F.3d 719, 733 (finding an instruction on reasonable doubt to be unconstitutional, where a later clarification of the term did not serve to "unring the bell"). As the Supreme Court explained in Francis, 471 U.S. at 322, other language in the instruction does not always serve to cure the error. This is so even when other language correctly explains the law. In Francis, the Court found that an erroneous jury instruction on intent created a mandatory presumption that the jury must infer a presumed fact if the state proved predicate facts. The Court concluded that this constitutional flaw had not been cured by subsequent language correctly explaining the operation of presumptions that immediately followed the challenged portion of the instruction. id. at 319-20. The Court reasoned that the additional language would not have clarified the issue, and may have permitted another, impermissible interpretation by a reasonable juror. Id. at 325.

Here, the location of the error in context with the rest of the charge, considered along with the correct, but confusing language in the instruction, causes us to view this "single deficiency" as quite problematic. Neither the correct statements of law within the instruction, nor the statement immediately after the instruction, completely negated or explained the absolutely incorrect statement of law in the context of the rest of the instructions. Moreover, the first correct statement of the law is itself somewhat confusing, because of the use of double negatives:"you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the

22

defendant was not so intoxicated at the time that he was incapable of judging his acts and consequences .. ." Appellants App. at 788–89 (emphasis added). The trial judge stated that he would repeat the instruction. However, it is likely that, upon hearing that, any juror who was even slightly confused by the previous instruction would have paid particular attention to the reiteration. That reiteration was, of course, incorrect. See Francis, 471 U.S. at 321 n.7 (noting that, after hearing conflicting intent instructions, it is reasonable to expect a juror "to attempt to make sense of a confusing earlier portion of the instruction by reference to a later portion of the instruction").

Immediately before repeating the instruction, the judge correctly stated that the Commonwealth had the burden of disproving the defense, but then misstated the law. Thus, it is reasonably likely, when considered in the context of the instructions on voluntary intoxication, that a juror believed that the defendant had to prove intoxication beyond a reasonable doubt and that the Commonwealth had the burden of disproving the defense by a lesser standard. Compare Humanik, 871 F.2d 442–43 (instructions unconstitutionally placed the burden of proof on the defendant)," and Johnson v. Rosemeyer, 117 F.3d 104, 111 (3d Cir. 1997) (no due process problem where defendant not entitled under federal law to have instruction contain certain elements of justification defense, contrasting cases where instruction unconstitutionally shifts burden of proof of an element onto defendant, in violation of due process).

Because it is reasonably likely that a juror interpreted the instruction as allowing a finding of specific intent to kill based on something less than proof beyond a reasonable doubt, the instruction arguably denied Whitney the due process of law. See Francis, 471 U.S. at 321 n.7.

The sentence immediately subsequent to the disputed phrase, stating that voluntary intoxication may reduce a murder from first degree to third degree, conceivably cured part of the problem. However, that explanation said nothing about the standard of proof required for intoxication. It did not explain that the Commonwealth was required to disprove intoxication beyond a reasonable doubt, or that

23

Whitney did not have to prove intoxication beyond a reasonable doubt. See Humanik, 871 F.2d at 442-43.

Thus, the Commonwealth's claim that "given the court's charge as a whole, no reasonable juror could possibly have concluded that Whitney could be found guilty of first degree murder only if he was intoxicated," Appellants Br. at 69, misses the point. The problem is not only that a reasonable juror might have actually believed that to be the case. The greater problem is that it was reasonably likely that a juror believed that intoxication had to be established beyond a reasonable doubt and/or that the prosecution then had to disprove the defense by a lower standard of proof. It is unreasonable and improper to assume that lay persons can recognize that an incorrect standard of proof has been described in a jury instruction.

> "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."

Boyde v. California, 494 U.S. 370, 380-81 (1990). However, expecting jurors' "common sense" judgment to prevail over the court's instructions would conflict with the presumption that juries follow their instructions. See Zafrio v. United States, 506 U.S. 534, 541 (1993). We presume "that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instruction in a criminal case and strive to understand, make sense of, and follow the instructions given them." Francis, 471 U.S. at 324 n. 9. Accordingly, we agree with the district court's conclusion that the trial court's charge on voluntary intoxication was erroneous.

C. Prejudice

Of course, our conclusion that the charge was erroneous does not end our inquiry. Instructional errors must often be examined for harmless error before a defendant is entitled

24

to relief. See Smith, 120 F.3d at 417 n.5 (citing Kontakis v. Beyer, 19 F.3d 110, 116 (3d Cir. 1994)). Accordingly, the harmless error test announced in Brecht v. Abrahamson, 507 U.S. 619 (1993), bears on our analysis. Under Brecht, an error must have a "substantial and injurious effect or influence in determining the jury's verdict" before it can be considered harmful and require relief. 507 U.S. at 632 n.7.

Moreover, Whitney alleges not only that the jury instruction was unconstitutionally infirm, but also that counsel was ineffective for failing to object at trial. In order to establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), Whitney must establish that trial counsel's stewardship fell below an objective standard of reasonableness, and that counsel's dereliction was prejudicial. Strickland, 466 U.S. at 687.18 Given our discussion of the nature of the defect in this charge, and the problems that arise from it, it follows a fortiori that unless counsel had a strategic reason for not objecting, Whitney will satisfy the first prong of Strickland. Whitney has not offered any testimony about trial counsel's reasons for not objecting, and Whitney has the burden of establishing ineffectiveness. However, we can not imagine any justification for a defense attorney not attempting to correct this kind of error in an instruction on the only

_____

18. Whitney argues that his ineffective assistance of counsel claim is exhausted. The Commonwealth disagrees. The district court concluded that "[i]t is undisputed that Whitney has no remaining avenue in the courts of Pennsylvania for litigating any of the claims he has alleged in his amended petition," and that "it is conceded that Whitney did not pursue, either on direct appeal or in his PCRA proceeding, a number of the claims alleged in his pending petition." Dist. Ct. Op. at 3.

The ineffective assistance of counsel claim actually has three components. In addition to challenging trial counsel's failure to object to
the charge, Whitney argues that trial counsel did not adequately investigate his intoxication before trial, and that he was ineffective in failing to present certain testimony related to his intoxication. We will limit our discussion to the first of these three components because our analysis as to that part of his claim disposes of the remaining components of his ineffectiveness claim. Moreover, that is the only claim that the district court reached, and it is the only ruling that is challenged on appeal.

25

defense his/her client could possibly have to a charge of capital murder.

However, in order to establish the requisite prejudice to satisfy the second prong of Strickland, Whitney must demonstrate "a reasonable probability that the result would have been different but for the professional errors." Deputy v. Taylor, 19 F.3d 1485, 1493 (3d. Cir. 1994). Because Whitney alleges in this one claim both a due process violation based upon the faulty jury instruction and a Sixth Amendment violation based upon counsel's failure to object, it is not readily apparent whether the Brecht standard for harmless error and/or the Strickland standard of prejudice should be applied.[19] However, we need not resolve that subtlety because, given the circumstances here, the ultimate issue under either test reduces to determining what effect, if any, the erroneous instruction had on the jury's verdict. Accordingly, if Whitney demonstrates that the erroneous instruction had a "substantial and injurious effect or influence in determining the jury's verdict," such that it was not harmless under Brecht, 507 U.S. at 637, he has also demonstrated that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. He would also have paved the way to excusing the procedural default by establishing "cause." See Coleman, supra. With these principles as our guide, we will examine the trial testimony to determine if Whitney can meet this burden.

The district court explained its conclusion that the erroneous charge warranted habeas relief as follows:

_____

19. The district court held that Whitney had established prejudice under Strickland. Dist. Ct. Op. at 21. The court did not apply the harmless error test of Brecht before finding prejudice under Strickland. Some cases have held that if a habeas petitioner meets the Strickland test, then he/she need not also demonstrate that the error was harmful. See Hill v. Lockhart, 28 F.3d 832, 838 (8th cir. 1994) (holding that analysis under Brecht harmless error test is unnecessary in evaluation of whether petitioner in habeas case has presented constitutionally significant claim for ineffective assistance of counsel); Smith v. Dixon, 14 F.3d 956, 974, 976 (4th cir. 1994) (en banc) (concluding that prejudice inquiry under Strickland is essentially the same inquiry as the harmless error inquiry).

26

> Given that there was sufficient evidence of Whitney's
> intoxication to make his state of mind a question for
> the jury, and given that the judge improperly
> instructed the jury on the law of specific intent and
> voluntary intoxication, there is a "reasonable
> probability" that, but for counsel's omission,"the result
> of the proceeding would have been different." Id. [citing
> Strickland.] Had counsel objected at trial, the court
> could easily have corrected the error and made the
> proper instruction clear. There is a reasonable
> probability that, if the error in the charge had been
> corrected, at least one juror would not have voted to
> convict petitioner of first degree murder. Our
> confidence in the conviction and sentence has been
> undermined by the seriously deficient representation of
> trial counsel. We conclude that Whitney has
> successfully established his claim of ineffective
> assistance of counsel under the Sixth and Fourteenth
> Amendments.

Dist. Ct. Op. at 21. We disagree. The evidence of Whitney's
state of mind was such that the integrity of his conviction
for first degree murder is not undermined in the least by
the erroneous jury charge.

It is uncontroverted that the victim suffered twenty-four
stab wounds, including a deep wound to the head, and
another wound to the ventricle of his heart. In
Pennsylvania, specific intent to kill may be demonstrated
by nothing more than use of a deadly weapon upon a vital
part of the body. See Commonwealth v. May, 540 Pa. 237,
656 A.2d 1335, 1340 (1995) (finding specific intent where
victim suffered five stab wounds to upper body);
Commonwealth v. Walker, 540 Pa. 80, 656 A.2d 90, 95
(1995) (finding specific intent where defendant shot one
victim in head and chest, another victim twice in the head,
and stated his intent to kill victim before shooting). Thus,
in Commonwealth v. Meredith, 490 Pa. 303, 311, 416 A.2d
481, 485 (1980), based upon the number and severity of
the blows inflicted, areas of the body where the blows were
administered, and relative size and age of the victim, the
court stated: "[i]f a deadly force is knowingly applied by the
actor to the person of another, the intent to take life is as

27

evident as if the actor stated the intent to kill at the time the force was applied."

Here, of course, Whitney did just that. He proclaimed his intent to kill during the course of his intrusion into the deceased's apartment. The jurors did not have to rely upon the circumstantial evidence of the number and severity of the wounds to determine if Whitney intended to kill. They could merely take him at his word. Whitney's announcement of his intent perfectly coincides with, and explains, the location and number of the victim's wounds. See Commonwealth v. Ford, 539 Pa. 85, 650 A.2d 433, 437 (1994) (specific intent to commit crime may be established through defendant's words or acts, or circumstantial evidence, considered with all reasonable inferences from that evidence) (citing Commonwealth v. Iacobino , 319 Pa. 65, 178 A. 823 (1935)). There was, therefore, no real issue about whether his blows just happened to land on a vital part of the victim's body.

Of course, the prosecution's burden in a criminal case is a high one. A capable defense attorney might attempt to raise a reasonable doubt by arguing to the jury that Whitney was so intoxicated that he did not know what he was saying, that he was simply ranting in a drunken stupor, and that his blows just happened to land on vital organs as he coincidentally stated an "intent" to kill. However, that was not the evidence. Whitney did not flail his arms about in a wild, unfocused, and uncontrolled manner. Nor was he ranting when he expressed his intent to kill his victim. Rather, the evidence easily establishes beyond a reasonable doubt that he knew exactly what he was saying, and exactly what he was doing. Murtaza testified that Whitney's demeanor was calm and collected. This is corroborated by his behavior while he was in her apartment. In the middle of that burglary, while struggling with Murtaza, he walked to her refrigerator to get a drink of water after ripping her clothes off and announcing that he was going to rape her and kill her husband.

We realize, of course, that there was evidence that Whitney was woozy, and that his speech was slurred, and he had alcohol on his breath. However, that is merely what entitled him to a voluntary intoxication charge. It must be

28

considered in context with the entire record, most of which is undisputed. For example, it is undisputed that Whitney was only able to perpetrate these attacks after he climbed onto a second-story ledge and then climbed through not one, but two windows. He was sufficiently cognizant to realize that his first victim might identify him, and he therefore inquired about her ability to recognize him. He then again negotiated the second-story ledge once again and maneuvered to the apartment where the fatal stabbing occurred. There, he was again able to climb from the ledge through a window. That is not consistent with the actions of one who is in a drunken stupor.

However, the most telling evidence of Whitney's lucid mental state is the fastidious manner in which he attempted to prevent Ms. Minor from speaking on the telephone. We refer not merely to his instructions to her when she tried to place a telephone call, but his actions in disabling her telephone as well. In disabling that phone, Whitney demonstrated motor coordination and dexterity, as well as presence of mind and cognition that was totally inconsistent with the level of impairment that might create a reasonable doubt about one's ability to form the specific intent to kill. He did not merely cut the telephone wires, he disassembled the telephone, unscrewed the speaker portion of the handset, and removed the microphone inside. He thereby rendered the phone inoperable. See id. at 357.

In addition, when Murtaza emptied her purse Whitney had sufficient mental facility to appreciate the amount of money she had and express disappointment that she did not have more. And he similarly demonstrated his intent to rape Murtaza, and clearly demonstrated an intent to do so by opening his pants and taking out his penis, just as he demonstrated his intent to kill by announcing his intent and then stabbing his victim twenty-four times.

A verdict may still stand, despite erroneous jury instructions, where the predicate facts "conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause the injury." Rose v. Clark , 478 U.S. 570, 580-81 (1986). "In that event . . . [,] the jury has found, in Winship's words, `every fact necessary' to establish every

29

element of the offense beyond a reasonable doubt." Carella v. California, 491 U.S. 263, 266 (1989) (per curiam) (quoting Rose, 478 U.S. at 580-81). That is what we have here.

"Surely, there is no substantial likelihood [this] erroneous . . . instruction[ ] prejudiced [Whitney's] chances with the jury." Frady, 456 U.S. at 174; See also Burger v. Kemp, 483 U.S. 776, 782 n.5 (1987) (erroneous instruction was harmless where evidence was so dispositive of intent that it could be said beyond a reasonable doubt that jury's deliberations were not affected by them). Faced with this evidence we do not understand how any reasonable jury could have had any doubt about whether Whitney was too inebriated to form the intent to kill. The evidence of Whitney's mental state was nothing short of overwhelming. Accordingly, we can not agree with the district court's conclusion that the erroneous instruction in any way undermined this verdict. Whitney's claim of prejudice fails under both Brecht and Strickland. There is no reasonable probability that, "but for counsel's failure to object to the faulty instruction, the result of the proceeding would have been different." Werts v. Vaughn, 228 F.3d 178, 193 (3d Cir. 2000) (quoting Sistrunk, 96 F.3d at 670). Similarly, the erroneous instruction could not have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, supra.

D. Fundamental Miscarriage of Justice / Actual
        Innocence

As noted above, we also excuse a procedural default where failure to excuse it would result in a fundamental miscarriage of justice. Accordingly, we will adjudicate the merits of a defaulted claim where it is more likely than not that no reasonable juror would have convicted a defendant absent the claimed error. See Schlup v. Delo, 513 U.S. 298, 326, (1995) (adopting the standard articulated in Murray v. Carrier, 477 U.S. 478, 496 (1986)). We also conduct this inquiry into "actual innocence" "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have

30

become available only after the trial." Schlup, 513 U.S. at 327, 115 S.Ct. at 867 (quotation omitted).

Whitney does not even have a colorable claim of actual innocence. In his amended habeas petition, he made an assertion in the context of another of his claims that he did not commit the homicide, and that "[a]t best, Mr. Whitney was merely a lookout with, at most, the intent to commit a burglary." Amended Habeas Petition for Writ of Habeas Corpus, at 151. He does not renew that assertion here. Moreover, in light of the foregoing discussion of the evidence of his intoxication, it is obvious that Whitney was not so intoxicated as to be unable to form the intent to kill. Accordingly, Whitney does not fall under the "actually innocent of the death penalty" exception that would have allowed the district court to reach the merits of his challenge to the jury instruction. See Schlup , supra. We therefore conclude that the district court erred in granting Whitney relief based upon the erroneous jury instruction.

V. Conclusion

In Weeks v. Snyder, 219 F.3d 245, 261 (3d Cir. 2000), we stated:

> [w]e are not unaware of the controversy currently surrounding the imposition of the death penalty in this country. However, this case does not trench upon the issues [so often] in the forefront of that controversy, usually identification of the defendant or the defendant's competency at any of the critical stages of the event or the criminal proceeding. . . . Whether this is an appropriate case for administration of the death penalty is a political question, not a judicial one.

Similarly, our task here is limited to reviewing the propriety of the district court's grant of habeas relief based upon the record and Whitney's assertions of error. For all the reasons set forth above, we hold that the district court's order granting habeas relief under 28 U.S.C. S 2254 must be vacated, and we will remand the matter for consideration of the remaining claims in Whitney's amended habeas petition. In doing so, we take no position as to whether the

31

district court is precluded from reaching the merits of any of those claims based upon any procedural default.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

32